**SSM HEALTHCARE SYSTEM, d/b/a Cardinal Glennon Children's Hospital, Plaintiff,**

v.

**Michael V. REAGEN, Ph.D., Director, Department of Social Services, State of Missouri, Defendant.**

No. 87–4092–CV–C–5.

United States District Court, W.D. Missouri, C.D.

Feb. 8, 1988.

David M. Harris, Greensfelder, Hemker, Wiese, Gale & Chappelow, P.C., St. Louis, Mo., for plaintiff.

Jerry Short, Office of Atty. Gen., State of Mo., Jefferson City, Mo., for defendant.

ORDER

SCOTT O. WRIGHT, Chief Judge.

Before the Court are cross-motions for summary judgment filed by plaintiff and defendant in this action seeking declaratory and injunctive relief. For the following reasons, the Court concludes that defendant's motion for summary judgment must be sustained and that plaintiff's motion for summary judgment must be denied.

*Factual Background*

The facts in this case are undisputed. Plaintiff SSM Healthcare System ("SSM") is a charitable not-for-profit corporation organized and existing under the laws of the State of Missouri. SSM operates Cardinal Glennon Children's Hospital ("Cardinal Glennon"), located in the City of St. Louis. Cardinal Glennon is a hospital offering acute pediatric care and is duly licensed by the State of Missouri to operate as a hospital pursuant to § 197.100 *et seq.*, Mo.Rev. Stat. (1986), and by the regulations promulgated thereunder.

Defendant Michael V. Reagen is being sued in his official capacity as Director of the Department of Social Services of the State of Missouri, which is responsible for administering Missouri's Medicaid program.

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396q, establishes a cooperative state and federal program of medical assistance for certain categories of low income individuals, commonly known as the "Medicaid Program." Missouri has participated in the Federal Medicaid Program

since 1967. The provisions of Title XIX are administered and enforced by the Secretary of Health and Human Services ("Secretary"). A state which fails to comply with appropriate terms and conditions of participation set forth in Title XIX and regulations promulgated thereunder is subject to loss of federal financial participation in funding its state Medicaid Program.

A state that participates in the Medicaid Program must submit a state plan for medical assistance and reimbursement ("State Plan") to the Secretary, through his designee Health Care Finance Administration ("HCFA"). The proposed State Plan and assurances are reviewed by HCFA at the regional and national level for conformance with federal guidelines. The State Plan must, among other things, establish a methodology for reimbursing providers of health care, such as hospitals, for covered services rendered to Medicaid beneficiaries that complies with the provisions of 42 U.S.C. § 1396a(a). More specifically, the State Plan is required by 42 U.S.C. § 1396a(a)(13) to provide for payment to hospitals at rates that take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs and that are reasonable and adequate to meet the costs associated with providing services for Medicaid beneficiaries.

Cardinal Glennon participates in Missouri's Medicaid program as a provider of health care services pursuant to a provider agreement that gives Cardinal Glennon the authority to provide inpatient or outpatient hospital services to qualified Medicaid recipients and to receive reimbursement for such services. As a children's hospital, Cardinal Glennon is exempt from Medicare's perspective reimbursement system and receives reimbursement from Medicare on the basis of a per diem rate established pursuant to the provisions of 42 C.F.R. § 413.1 *et seq.* Cardinal Glennon receives a minimal amount of Medicare funding. In fiscal year 1985, only 300 of Cardinal Glennon's over 12,000 total actual patient days were Medicare patient days. Cardinal Glennon's current Medicare per diem rate is $637.41.

Pursuant to Mo.Rev.Stat. § 207.020 and § 208.153 (1986), the Missouri Department of Social Services has promulgated rules and regulations that establish the basis for reimbursement of Medicaid-covered inpatient hospital services under Missouri's State Plan. Those regulations are set forth at 13 C.S.R. 40–81.050. Pursuant to 13 C.S.R. 40–81.050(1)(A), defendant reimburses hospitals for medical services rendered to Medicaid beneficiaries at the lower of (a) the Medicaid per diem rate for the prior year plus an adjustment for inflation, (b) a hospital's most current Medicare per diem rate on file with defendant, but only if the hospital is not reimbursed by Medicare on the basis of Diagnosis Related Groups ("DRG"), or (c) the hospital's per diem rate based on the third prior year's cost plus adjustments for inflation. In 13 C.S.R. 40–81.050(5)(F)(2)(C), defendant has established a rate reconsideration mechanism to adjust the per diem rate upward to reflect the additional cost to hospitals that serve a disproportionate number of low income persons with special needs ("Disproportionate Share Hospitals").

On September 19, 1986, defendant filed an emergency regulation amending the provisions contained in 13 C.S.R. 40–81.050 relating to per diem rates for Disproportionate Share Hospitals ("Emergency Regulation"). This Emergency Regulation became effective as an emergency rule on October 1, 1986, and as a final state regulation on February 1, 1987. The Emergency Regulation amended the definition of a Disproportionate Share Hospital. In order to qualify as a Disproportionate Share Hospital under the Emergency Regulation, 15 percent or more of the hospital's patient days for the third prior year must be for Medicaid beneficiary days and 15 percent or more of all patient days for the third year must be unreimbursed.

If a hospital qualified as a Disproportionate Share Hospital, the Emergency Regulation provided a new formula for calculating the per diem rate for such hospitals. The Emergency Regulation formula reimbursed Disproportionate Share Hospitals based on 95% of the hospital's operating costs, plus

those capital and medical education costs allowable under reimbursement rules over the number of Medicaid days actually paid by Medicaid for that hospital. The Emergency Regulation, however, places a cap on reimbursement to Disproportionate Share Hospitals that are exempt from Medicare's prospective reimbursement system. The relevant language provides that "[f]or facilities that are exempt from Medicare's prospective Reimbursement System (Diagnosis Related Groups), the facility's Medicaid disproportionate rate shall be the lower of the facility's rate per day as determined by Medicare or the disproportionate rate as determined in subparagraph V.F. 2(3). ("Per Diem Cap") 13 C.S.R. 40–81.-050(2)(F)2.F. Thus, a disproportionate share hospital like plaintiff's that is exempt from Medicare's prospective reimbursement system is reimbursed in an amount equal to either that hospital's Medicare per diem rate or the rate determined in subparagraph V.F.2(e), whichever is lower.

Cardinal Glennon qualified as a Disproportionate Share Hospital under the criteria established by the Emergency Regulations and was reimbursed for its Medicaid patient days by defendant pursuant to the Emergency Regulations for the period from October 1, 1986 through July 15, 1987. Cardinal Glennon qualifies as a Disproportionate Share Hospital under the criteria established by the Final Regulations and will be reimbursed for its Medicaid patient days by defendant pursuant to the Final Regulations beginning February 1, 1987.

If Cardinal Glennon was reimbursed in accordance with the formula for Disproportionate Share Hospitals as set forth in the Emergency and Final Regulations, without the Per Diem Cap, Cardinal Glennon would be reimbursed at a per diem rate of $660.00 for its Medicaid patient days. However, because of this Per Diem Cap, Cardinal Glennon was, and continues to be, reimbursed at its Medicare per diem rate of $637.41, $22.59 less than the per diem rate without a Per Diem Cap. Consequently, Cardinal Glennon lost approximately $55,-000.00 in reimbursement for Medicaid patient days between October 1, 1986 and

January 15, 1987, as a direct result of the Per Diem Cap. Additionally, the Per Diem Cap will cost Cardinal Glennon approximately $217,852.00 annually in reimbursement for Medicaid patient days as a direct result of the Per Diem Cap.

On about August 13, 1986, 42 U.S.C. § 1396a was amended by the addition of a new subsection, § 1396a(h), through § 9433 of the Omnibus Budget Reconciliation Act of 1986, P.L. 99–509. This amendment provides that:

> "Nothing in this subchapter (including subsections (a)(13) and (a)(30) of this section) shall be construed as authorizing the Secretary to limit the amount of payment adjustments that may be made under a plan under this subchapter with respect to hospitals that serve a disproportionate number of low-income patients with special needs." *Id.*

In its suit for declaratory and injunctive relief, plaintiff alleges that the Per Diem cap violates the newly enacted § 1396a(h) and, thus, is preempted by the Supremacy Clause of the United States Constitution, Article VI, Clause 2. Plaintiff's suit, brought pursuant to 42 U.S.C. § 1983, also seeks attorney's fees pursuant to 42 U.S.C. § 1988. Both parties have now filed cross-motions for summary judgment, stipulating that there are no genuine issues as to any material fact.

Thus, the very narrow question before this Court is whether 42 U.S.C. § 1396(a)(h) prohibits defendant from imposing the Per Diem Cap, as contained in the Emergency and Final Regulations, which limit the amount of reimbursement a Disproportionate Share Hospital can receive under the Medicaid Program. For the following reasons, the Court concludes that § 1396a(h) presents no bar to defendant's establishment of the Per Diem Cap, and, thus, summary judgment must be granted in favor of defendant.

## Discussion

Preliminarily, it should be noted that the same standard of review afforded federal agency action applies to actions of a state

agency administering federal Medicaid funding: a court is limited to deciding whether the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Social Security Act. *Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983); *Friedman v. Perales,* 668 F.Supp. 216, 221 (S.D.N.Y.1987); *Mary Washington Hospital, Inc. v. Fisher,* 635 F.Supp. 891, 897 (E.D.Va.1985). It should also be noted that a presumption of validity attaches state agency action, and the burden of proof rests with the party challenging such action. *Alabama Nursing Home Asso. v. Harris,* 617 F.2d 388, 393 (5th Cir.1980); *Freidman v. Perales,* 668 F.Supp. at 221. Finally, the Court must recognize the fact that federal law and, more specifically, the Medicaid portion of the Social Security Act, gives each state great latitude in dispensing its available Medicaid funds. *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L.Ed.2d 491 (1970). *See also Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d at 516 ("The function and expertise of the federal courts in this sphere is limited, and our role does not extend to rethinking the political and financial concerns behind a particular payment plan"); *Friedman v. Perales,* 668 F.Supp at 221 (The Court is not to rethink or reweigh the political and financial considerations that might have animated the decision to adopt a particular reimbursement scheme).

In its claim for declaratory and injunctive relief, plaintiff alleges that:

"The Per Diem Cap violates 42 U.S.C. § 1396a(h), as adopted in P.L. 99–509 § 9433, and is preempted by the Supremacy Clause of the United States Constitution, Article VI, Clause 2. In addition, the Per Diem Cap violates Cardinal Glennon's rights under 42 U.S.C. § 1983." Plaintiff's Complaint ¶ 31.

In support of this contention, plaintiff argues that the Per Diem Cap enacted by the Missouri Department of Social Services is in direct conflict with the newly-enacted 42 U.S.C. § 1396a(h) because this new subsection prohibits *any* payment limitation by a state to hospitals found to serve a dispro-

portionate number of low income patients with special needs. Plaintiff also argues that while § 1396a(h) on its face appears only as a limitation on the Secretary placing a limit on disproportionate share hospitals, the Court should also read this subsection as limiting the Secretary's authority to approve any State Plan provision that limits payment adjustments to disproportionate share hospitals. However, the Court, having analyzed the legislative history behind the enactment of Title XIX and § 1396a(h), concludes that plaintiff has failed to meet its burden of proving that the Per Diem Cap as set forth in the state regulation is inconsistent with or conflicts with § 1396a(h).

As previously noted, the Medicaid program is a cooperative federal-state program set up to provide medical services to the poor. While the federal government provides funding, the program is administered by each state in accordance with a state plan approved by the Secretary of Health and Human Services. Even though participation in the program is voluntary, once a state chooses to participate it must comply with federal statutory requirements. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784, 794 (1980).

Originally, states were required to reimburse hospitals for inpatient services provided to Medicaid patients on the basis of cost methodology used by the Secretary of Health and Human Services in its administration of the federal Medicare program. However, a number of subsequent legislative enactments modified the reimbursement scheme, permitting each state to develop its own alternative reimbursement methodology.

In 1972, Congress amended Title XIX of the Social Security Act to require that a state plan for long-term health care assistance provide:

"for payment of the skilled nursing facility and intermediate care facility services provided under the plan on a *reasonable cost basis,* as determined in accordance with methods and standards which shall be developed by the State on the basis of

cost-finding methods approved and verified by the Secretary...."

Social Security Amendments of 1972, § 249(a), 42 U.S.C. § 1396a(13)(E) (emphasis added).

As noted in *Alabama Nursing Home Association v. Harris*, 617 F.2d 388. (5th Cir. 1980), by this amendment:

"Congress intended that state authorities in developing methodologies for reasonable cost related reimbursement have great flexibility in the areas of cost-finding and rate-setting. The legislative history indicates that states are to be free to experiment with methods and standards for payment that would be simpler and less expensive than the complex Medicare reasonable cost formula. See S.Rep. No. 92–1230, 92nd Cong., 2d Sess. 287 (1972).... Additionally, Congress intended that states have freedom both to define allowable cost items and to set a value on the reasonable cost of such items. Thus, between 1972 and 1981, states were encouraged to develop alternative reimbusement schemes under this 'reasonable cost standard,' which obligated the Secretary to approve and verify the cost-finding methods utilized in a state's reimbursement plan as well as the State's methodologies for rate-setting. *Id.* at 392.

On July 31, 1981, Congress enacted the Omnibus Budget Reconciliation Act of 1981, Public Law 97–35. Section 2173 of that Act repealed the "reasonable cost" standard and replaced it with requirements designed to give states even greater flexibility in establishing reimbursement rates. Under this new standard, states are now required to make payments "through the use of rates (determined in accordance with methods and standards developed by the State and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs....) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...." 42 U.S.C. § 1396a(a)(13)(A). Thus, this new standard is less burdensome on the states in that before, the states' methods and standards had to be reviewed and approved by the Secretary, whereas now a state merely has to make assurances to the Secretary that its rates of reimbursement are reasonable and adequate to meet costs incurred by a facility. *See, e.g.* S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 U.S. Code Cong. & Ad. News 396, 744. ("[T]he Secretary will keep regulatory and other requirements to the minimum necessary to assure proper accountability, and not to overburden the States and facilities with unnecessary and burdensome paperwork requirements. It is expected that the assurances made by the States will be considered satisfactory in the absence of a formal finding to the contrary by the Secretary.")

In order to implement this payment provision, the Health Care Finance Administration (HCFA), on the behalf of the Secretary, has promulgated a number of regulations. The regulation of particular concern here is the "upper limit" test set forth in 42 C.F.R. § 447.253(b)(2). This regulation, promulgated in 1983, provided that in order to receive HCFA approval of a significant state plan change in payment methods and standards, the state agency must make assurances satisfactory to HCFA that: "the Medicaid agency's estimated average proposed payment rate is reasonably expected to pay no more in the aggregate for inpatient hospital services or long-term care facility services than the amount that the agency reasonably estimates would be paid for the services under the Medicare principles of reimbursement." 42 C.F.R. 447.-253(b)(2).

Since this upper limit test was applied in the aggregate, a state plan could allow the costs of a disproportionate share provider to exceed its forecasted "upper limit" if in the aggregate the cost for all hospitals covered by the plan remained under the limit.

On February 18, 1986, HCFA proposed to amend its regulations in order to require that a separate upper payment limit be

computed if a separate payment methodology was applied to a group of facilities. Therefore, if a state utilized a different share rate methodology for disproportionate share hospitals, those hospitals would be subject to a separate Medicare upper payment under the proposed regulation. The proposed amendment stated that:

"Payments by an agency for inpatient hospital services or long-term care facility services to hospitals, SNFs, ICFs, or ICFs for the mentally retarded (ICFs/MR) may not exceed the amount that can reasonably be estimated would have been paid for the services under Medicare reimbursement principles in effect at the time the services were furnished. If a State uses separate ratesetting methodologies for these categories of facilities, then the agency must apply the upper payment limit to the payments made to each facility or group of facilities that is paid under each of the separate ratesetting methodologies." 51 Fed. Reg. at 5733 (Feb. 18, 1986).

After publication of this proposed regulation, Congress passed § 1396a(h), apparently reacting to the adverse effect that this "upper limit" would have on Disproportionate Share Hospitals.

As enacted, 42 U.S.C. § 1396a(h) provides that:

"Nothing in this subchapter (including subsections (a)(13) and (a)(30) of this section) shall be construed as authorizing the *secretary* to limit the amount of payment adjustments that may be made under a plan under this subchapter with respect to hospitals that serve a disproportionate number of low-income patients with special needs." (emphasis added)

The legislative history of § 1396a(h), as set forth in House Report No. 99–727, suggests that this subsection was directed at HCFA's and the Secretary's attempt to apply a Medicare rate upper payment limit to Disproportionate Share Hospitals. The relevant portion of the House Report reads:

*"Clarification of the flexibility for State Medicaid payment systems for inpatient services* (Sec. 4633)

Under current law, States must find, and give the Secretary, adequate assurances that, the rates of payment for covered inpatient hospital services are 'reasonable and adequate to meet the cost which must be incurred by efficiently and economically operated fcilities.' This standard, enacted in Section 2173 of the Omnibus Budget Reconciliation Act of 1981, P.L. 97–35, replaced the previous requirement that States use the Medicare 'reasonable cost' payment methodology unless they obtained approval from the Secretary to use an alternative reimbursement method. The purpose of this statutory change was to give the States greater flexibility, within the contours of the Medicaid statute, in establishing payment rates and methodologies.

Recently, HCFA published a proposed rule which would limit payments for inpatient hospital services or long-term care facility services to hospitals, SNFs, ICFs and ICFs/MR to the amount that can reasonably be estimated would have been paid for the services under Medicare reimbursement principles in effect at the time the services were furnished. 51 Fed.Reg. 5728 (Feb. 18, 1986). HCFA contends that this proposal is consistent with the intent of sections 1902(a)(13)(A) and 1902(a)(30) of the Act. HCFA is incorrect.

There is no reference to Medicare reimbursement principles in the Medicaid statute with respect to payment for inpatient services for hospitals, SNFs, ICFs, or ICFs/MR, and there has not been any such reference since the enactment of OBRA. The reason for this is quite simple. The committee has intended, and does intend, that Medicare principles of reimbursement or payment levels not be applied as a limit on Medicaid payments for inpatient services. The Medicaid statute contains a separate set of reimbursement principles designed to accommodate the needs of both the States and the Federal government in administering the Medicaid program. Medicare payment requirements have neither relevance nor applicability to the Medicaid program. Of course, *States have the*

*option to use Medicare payment methodologies and rates if they so choose;* however, the Secretary has no authority whatsoever to require them to do so, or to impose Medicare-related limits of any kind on their payment rates." (emphasis added) H.R. No. 99–727, *reprinted in* 1986,

U.S. Code Cong. & Ad. News, 3607 at 3711–12.

In response to the enactment of § 1396a(h), which was effective retroactively as if it was included in the Omnibus Budget Reconstruction Act of 1981, HCFA issued a revised version of its upper limit test set forth in 42 C.F.R. § 447.272, which became effective on July 28, 1987, by adding the following language in § 447.272(C):

> "*Exception.* The upper payment limitation established under paragraphs (a) and (b) of this section does not apply to payment adjustments made under a State plan to hospitals found to serve a disproportionate number of low income patients with special needs, as provided in § 447.253(b)(1)(ii)(A)."

During the notice and comment phase of the amendment, HCFA noted the following:

> "Section 9433 of the Omnibus Budget Reconciliation Act of 1986 (Pub.L. 99–509) enacted on October 21, 1986 amends section 1902 of the Act to prohibit placement of a limitation on the amount of payment adjustments that may be made under a Medicaid State plan with respect to those hospitals that provide services to a 'disproportionate number of low income patients with special needs.' In effect, this section specifically exempts payments made, in accordance with the requirements of section 1902(a)(13)(A) of the Act, by States to hospitals for care furnished to a disproportionate number of low income patients with special needs from any limits established under Medicaid. Section 9433 of Pub.L. 99–509 is effective retroactively as though it was included in section 2173 of Pub.L. 97–35. We have, therefore, revised the proposed § 447.272 to state that the upper payment limit calculation does not apply to State payment adjustments

made to hospitals that provide care and services to a disproportionate number of low income patients with special needs, as described in the State plan." 52 Fed. Reg. 28141, 28145 (July 28, 1987).

In light of the foregoing legislative and administrative backdrop, it becomes clear that plaintiff's claim—that § 1396a(h) serves as a bar to the Missouri Department of Social Services's Per Diem Cap—must be rejected. First, the language in § 1396a(h) plainly states that nothing shall be construed as "authorizing *the Secretary* to limit the amount of payment adjustments" that can be made to Disproportionate Share Hospitals. There is nothing in this language which would appear to limit a state from establishing reimbursement rates which are tied to the Medicare per diem rate.

Second, and most importantly, there is nothing in the legislative history to even remotely suggest that Congress, in enacting § 1396a(h), intended that this provision serve as a constraint on a state's determination of the appropriate Medicaid reimbursement methodology. On the contrary, the legislative history suggests that the only purpose of this enactment was to prevent the Secretary, through the HCFA, from *requiring* states to tie their Medicaid reimbursement rates to the Medicare per diem rate. Plaintiff has cited nothing which persuasively suggests that Congress, in § 1396a(h) or any other provision in Title XIX, has intended anything other than to give states greater flexibility in setting reimbursement rates.

Therefore, the Court concludes that plaintiff has failed to maintain its burden of proving that the Per Diem Cap set forth in 13 C.S.R. 40–81.050(5)(F)2.F is contrary to, or in contradiction with, federal law or that the passage of this Per Diem Cap constitutes an abuse of discretion on the part of the Missouri Department of Social Services. Thus, in light of the presumption of validity that attaches to state agency action, the Court must grant defendant's motion for summary judgment and deny plaintiff's cross-motion for summary judgment.

**632**

Accordingly, it is hereby

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that defendant's motion for summary judgment is granted and that judgment be entered in favor of defendant. It is further

ORDERED that each party is to bear its own costs.