**BETHANY MEDICAL CENTER, Plaintiff,**

v.

**Dr. Robert C. HARDER, individually, and Dr. Winston Barton, Secretary of Kansas Department of Social and Rehabilitation Services, Defendants.**

Civ. A. No. 85–2415.

United States District Court,
D. Kansas.

May 20, 1988.

As Amended July 1, 1988.

Mary Beth Blake, Reid F. Holbrook, Holbrook & Ellis, P.A., Kansas City, Kan., for plaintiff.

Matthew W. Boddington, Legal Div., State Dept. of Social and Rehabilitation Services, Topeka, Kan., for Secretary of Kansas Dept. of Social and Rehabilitation Services.

Robert A. Olsen, Asst. U.S. Atty., Kansas City, Kan., Kristi A. Schmidt, Dept. of Health and Human Services, Kansas City, Mo., for Department of Health and Human Services and Margaret M. Heckler.

Patrick D. Gaston and Robert F. Bennett, Prairie Village, Kan., for Robert C. Harder.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

Plaintiff Bethany Medical Center originally brought this action against Dr. Robert C. Harder, former Secretary of the Kansas Department of Social and Rehabilitation Services. The action arises under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1983. In this action, plaintiff has challenged the validity of the Kansas Medicaid Plan's method of reimbursing costs for inpatient hospital services. Specifically, plaintiff alleges that the state plan fails to "take into account" hospitals that "serve a disproportionate number of low income patients with special needs" as required by 42 U.S.C. § 1396a(a)(13)(A).

Plaintiff Bethany Medical Center [hereinafter "plaintiff" or "Bethany"] is a not-for-profit private hospital located in Kansas City, Kansas. In this action, Bethany has pursued two claims against Dr. Harder. First, it has requested declaratory and injunctive relief that will invalidate the state plan and compel the defendant to develop a medicaid reimbursement plan that complies with the disproportionate share provision of section 1396a(a)(13)(A). Plaintiff also seeks a declaration that it is a disproportionate share hospital. This claim was brought against Dr. Harder in his official capacity. While this action was pending, however, Dr. Winston Barton replaced Dr. Harder as Secretary of the state agency. Pursuant to a verbal order entered on April 29, 1988, Dr. Barton was substituted as the defendant in the claim for declaratory and injunctive relief.

In the second claim asserted by Bethany, the hospital seeks monetary damages from Dr. Harder in his individual capacity pursuant to 42 U.S.C. § 1983. In this claim, plaintiff contends that Dr. Harder violated

its right to appropriate medicaid reimbursement under section 1396a(a)(13)(A). Bethany also contends that Dr. Harder violated its rights under the Due Process and Equal Protection Clauses of the United States Constitution.

This matter was tried to the court on December 14–17, 1987, and post-trial briefs were subsequently filed by the parties. The court heard closing arguments on April 29, 1988, at which time the matter was submitted for determination. The court has reviewed the parties' briefs, the entire transcript and all exhibits and is now prepared to rule.

I. *Development of Disproportionate Share Legislation.*

In order to place plaintiff's claims in context, the court will briefly describe the development of the disproportionate share provision that is the focus of this case. Title XIX of the Social Security Act (commonly known as the Medicaid Act) was originally enacted by Congress in 1965. The Medicaid program is a cooperative federal-state endeavor to provide medical assistance to poor persons. A state's involvement in the Medicaid program is purely voluntary. However, once a state opts to establish a medicaid program, it must develop a satisfactory state plan and submit the plan to the Secretary of Health and Human Services [hereinafter "the Secretary"] for approval. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed. 2d 784 (1980); *Bethany Med. Cent. v. Harder,* 641 F.Supp. 214, 216 (D.Kan.1986). The federal government will reimburse a state for a portion of its medicaid expenditures, but only if the state plan meets all the requirements of the federal statute and the implementing regulations. *See* 42 U.S. C. § 1396b; *see also SSM Healthcare Sys. v. Reagen,* 681 F.Supp. 625, 626 (W.D.Mo. 1988).

Prior to 1980, states were required to reimburse medical facilities for their Medicaid costs through rates calculated "on a reasonable cost-related basis, as determined in accordance with methods approved and verified by the Secretary." *See Colorado Health Care Ass'n v. Colorado Dept. of Social Serv.,* 842 F.2d 1158, 1161 n. 1 (10th Cir.1988). In 1981, Congress abandoned the cost-based reimbursement philosophy when it enacted the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 358 [hereinafter "OBRA–1981"]. Congress recognized that cost-based reimbursement was "inherently inflationary and contain[ed] no incentives for efficient performance." S.Rep. 97–139, 97th Cong., 1st Sess. 1, 478, *reprinted in* 1981 U.S.Code Cong. & Admin.News 396, 744 [hereinafter S.Rep. 97–139]. In renouncing cost-based reimbursement, Congress intended to give the states more flexibility in determining appropriate reimbursement rates. After OBRA–1981, inpatient hospital services were to be reimbursed through "rates that were reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."[1]

However, some members of Congress were concerned that abandoning cost-based reimbursement would negatively impact on hospitals that served large populations of low income patients, possibly decreasing the number of facilities participating in the Medicaid program. *See* H.R.Rep. 97–158, at 293. Because of this concern, the House of Representatives proposed an extra provision requiring states, in determining appropriate reimbursement rates for inpatient hospital services, to take into account the special costs of hospitals whose patient populations were disproportionately composed of individuals eligible for medical assistance or persons with no source of third-party payment for such services. *Id.* at 295. The Senate version of OBRA–1981 did not contain any disproportionate share provision. The Conference Committee adopted the Senate version of the bill, but

---

**1.** Congress deleted the requirement of cost-based reimbursement for services provided by skilled nursing and intermediate care facilities in 1980. *See* Omnibus Reconciliation Act of 1980, Pub.L. No. 96–499, § 962, 94 Stat. 2609, 2650–51. *See also Colorado Health Care Ass'n v.*

*Colorado Dept. of Social Serv.,* 842 F.2d at 1161. In OBRA–1981, Congress extended this flexibility to reimbursement of inpatient hospital services. Pub.L. No. 97–35, § 2173. These amendments were codified together at 42 U.S.C. § 1396a(a)(13)(A) (1982).

inserted disproportionate share language similar to that initially proposed by the House. *See* House Conf.Rep. 97–208, 97th Cong., 1st Sess. 653, 962, *reprinted in* 1981 U.S. Code Cong. & Admin. News 1010, 1324 [hereinafter Conf.Rep. 97–208]. As codified, OBRA–1981 required state plans to provide for the payment of services:

> through the use of rates ... which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ... which the State finds ... are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities....

42 U.S.C. § 1396a(a)(13)(A).

█ In addition to the increased flexibility given to the states in establishing reimbursement methodologies, OBRA–1981 reduced federal regulatory control over the states. Under OBRA–1981, a state which develops a new reimbursement plan, or significantly amends an existing plan, is required to submit the plan to the Health Care Financing Administration [HCFA] for approval. *See Wisconsin Hospital Ass'n v. Reivitz*, 733 F.2d 1226, 1234 (7th Cir. 1984). Along with the plan, the state must make certain assurances that the plan complies with the various provisions of section 1396a(a). 42 C.F.R. § 447.253 (1986). The regulations also require the states to provide HCFA with information relating to the assurances. 42 C.F.R. § 447.255. In this process, HCFA's only authority is to ensure that the states submitting plan amendments comply with the regulations by providing the required assurances; the agency

had no obligation to independently evaluate the accuracy of the state's determination of efficient and economical operations.[2] *See* 48 Fed.Reg. 56046, 56051 (1983); *Colorado Health Care Ass'n v. Colorado Dept. of Social Serv.*, 842 F.2d at 1166.

The disproportionate share issue has been the subject of considerable activity in Congress since the enactment of OBRA–1981.[3] In 1985, Congress became concerned about the treatment of disproportionate share hospitals under the various states' medicaid plans. Consequently, Congress enacted the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, 100 Stat. 82 ["COBRA–1985"]. In COBRA–1985, the Secretary was ordered to provide Congress with a report on the methodologies used by the states in dealing with disproportionate share hospitals and the amount of adjustments given to such hospitals by the various states. COBRA–1985, Pub.L. No. 99–272, § 9519. On January 30, 1987, Secretary Otis Bowen submitted a report to Congress describing a wide variety of payment methodologies used by the states under the disproportionate share provisions.

In reviewing the report submitted by the Secretary, Congress found a "startling record of noncompliance" and "indifference, if not hostility, of HCFA and many States to the 1981 statutory requirement." *See* H.R.Rep. 100–391(I), 100th Cong., 1st Sess. 1, 525, *reprinted in* 1987 U.S. Code Cong. & Admin. News 2313–1, 2313–345. Congress subsequently enacted the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330 [hereinafter "OBRA–1987"]. In section 4112 of OBRA–1987, Congress sets out minimum

---

**2.** As noted in the legislative history: "The committee expects that the Secretary [of Health and Human Services] will keep regulatory and other requirements to the minimum necessary to assure proper accountability, and not to overburden the States and facilities with unnecessary and burdensome paperwork requirements." S.Rep. No. 97–139, at 478, 1981 U.S.Code Cong. & Admin.News 7440.

**3.** Congress has added a disproportionate share provision to the Medicare program. *See* Social Security Amendments of 1983, Pub.L. No. 97–21, § 601(e), 97 Stat. 157. *See also* Deficit Re-

duction Act of 1984, Pub.L. No. 98–369, § 2315(h), 98 Stat. 1080 (requiring the Secretary to develop a national definition of Disproportionate Share Hospitals under Medicare).

Congress also has stepped in to prevent HCFA from placing an upper limit on adjustments given to disproportionate share hospitals under Medicaid. *See* Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, § 9433, 100 Stat. 2049, 2067 (codified at 42 U.S.C. § 1396a(h)); *see also SSM Healthcare Sys. v. Reagen*, 681 F.Supp. 625, 627 (W.D.Mo.1988).

standards for defining disproportionate share hospitals. OBRA–1987 requires the states to amend their plans by July 1, 1988, to include a definition of a disproportionate share hospital that meets or exceeds the definition set forth in the legislation. OBRA–1987 was enacted several days after the testimony was concluded in this case.

## II. *The Kansas Medicaid Plan.*

Under Kansas law, the Department of Social and Rehabilitation Services (SRS) is charged with the overall responsibility for developing, implementing and administrating the state's Medicaid plan. K.S.A. 39–708c(a). The Secretary of SRS is given, by statute, the power to determine the general policies in all social welfare programs he administers and to adopt rules and regulations to carry out those policies. K.S.A. 39–708c(b). Dr. Robert Harder was the Secretary of SRS from 1973 until July of 1987, when he was replaced by Dr. Winston Barton. As the agency secretary, these men exercised ultimate supervision of over 9,000 SRS employees.

Prior to 1983, the Kansas Medicaid Plan incorporated a cost-based reimbursement system patterned after federal Medicare reimbursement principles. In 1978–79, however, Dr. Harder and his staff decided to study and develop a prospective payment system for reimbursing allowable costs under Medicaid. After several years of study, such a plan was developed and scheduled to be implemented beginning in 1981. However, due to concerns expressed by the Kansas Hospital Association and the intervening enactment of OBRA–1981, this system never went into effect. Instead, SRS held a series of negotiations with the Kansas Hospital Association to work out a prospective payment system in light of OBRA–1981.

In 1983, Dr. Harder submitted an amended Kansas Medicaid Plan to HCFA for approval. The plan called for a prospective payment system to be used to reimburse inpatient hospital costs for persons eligible for Medicaid. Reimbursement rates were to be calculated as follows. First, SRS would determine each individual hospital's allowable costs under Medicaid for the 1981 program year and reduce it to a per diem rate. The individual hospitals' 1981 costs would then be increased by an inflationary factor to "roll forward" the rates to 1983 figures. These rates would be paid to the hospital per Medicaid day. Each year, the agency would determine an appropriate inflation rate and adjust the hospitals' individual rates accordingly. The plan also contained an appeal provision permitting an adjustment to hospitals that proved that the prospective payment rates they were receiving totaled less than ninety percent (90%) of their allowable costs for that particular year. K.A.R. 30–5–81s. Although it was not a part of the plan submitted to HCFA, SRS had also entered into a Memorandum of Understanding with the Kansas Hospital Association which called for the payment rates to be "rebased" every five years in order to keep the rates "hospital-specific."

The Kansas Plan, as submitted in 1983, did not contain a specific definition of a "disproportionate share hospital" or "low income patient." In assurances sent by Dr. Harder to HCFA in 1982 through 1985, Dr. Harder stated that "there are no disproportionate share hospitals in Kansas." In 1985, however, SRS promulgated a new regulation specifically defining "disproportionate share" in the Kansas plan. Under this regulation, a hospital would be considered to serve a disproportionate share of low income patients if its total number of Medicaid days equalled or exceeded twenty percent (20%) of its total patient days for a period of three consecutive years. K.A.R. 30–5–58(s). At the time this regulation was promulgated, no hospital in Kansas satisfied the test in K.A.R. 30–5–58(s). Nor had any hospital in the three preceding years reached the twenty percent level.

Plaintiff challenges this reimbursement plan in several respects. First, plaintiff contends that the plan, as it existed before 1985, did not comply with federal law because it did not define "disproportionate share hospitals" or "low income patient." Bethany also argues that the 1985 regulation defining "disproportionate share" is

arbitrary and capricious and therefore, invalid.

### III. Claim for Declaratory and Injunctive Relief.

In addressing the merits of Bethany's claims, the court will first focus on its requests for declaratory and injunctive relief. In these claims, Bethany seeks a declaration that the Kansas Medicaid Plan fails to comply with the disproportionate share requirements of 42 U.S.C. § 1396a(a)(13)(A). The hospital also seeks a judicial declaration that it is a disproportionate share hospital. Finally, plaintiff requests a mandatory injunction ordering Dr. Barton and SRS to develop and implement a reimbursement plan that complies with the federal statute and that pays extra benefits to Bethany and any other disproportionate share hospital.

■ Before the court may address the merits, however, we must determine whether the enactment of OBRA–1987 has mooted these claims. The doctrine of mootness is presently viewed as a constitutional principle grounded in Article III's requirement of a "case or controversy."[4] *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). In determining whether a "case or controversy" exists, the court must focus on whether the facts alleged, under all circumstances, show that there is a substantial controversy of sufficient immediacy and reality between parties having adverse legal interests. *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). There must be a real and substantial controversy that can be resolved through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937); *Blinder, Robinson & Co., Inc. v. S.E.C.*, 748 F.2d 1415, 1418 (10th Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985). The controversy must exist at all stages of the proceedings, not merely at the time the complaint was filed. *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

These principles of mootness apply equally to actions for declaratory judgments under 28 U.S.C. § 2201. *Golden v. Zwickler*, 394 U.S. at 108, 89 S.Ct. at 959. For the court to rule on the merits of a request for injunctive or declaratory relief, there must exist a "subject matter upon which the judgment of the court can operate." *New Jersey Turnpike Auth. v. Jersey Central Power & Light*, 772 F.2d 25, 30 (3d Cir. 1985).

In this case, Congress enacted OBRA–1987 shortly after the trial was held. Under OBRA–1987, all states participating in the Medicaid program are required to submit plan amendments by July 1, 1988, which incorporate a definition of disproportionate share hospitals. Furthermore, each state's definition is required to include all hospitals within its jurisdiction that satisfy the minimum standards set forth by Congress. Pub.L. No. 100–203, § 4112.[5]

The enactment of OBRA–1987 has established, for the first time, definite standards to be used in applying the disproportionate share provisions in section 1396a(a)(13)(A). Under this new federal law, the Kansas Medicaid Plan must be amended. Counsel

---

**4.** Many courts have recognized that the doctrine of mootness was initially based on the common law concern with more practical considerations of judicial economy. *See, e.g., New Jersey Turnpike Auth. v. Jersey Central Power & Light*, 772 F.2d 25, 31 n. 11 (3d Cir.1985); *Tennessee Gas Pipeline Co. v. Federal Power Comm'n*, 606 F.2d 1373, 1379 (D.C.Cir.1979).

**5.** This section provides, in part:

(b) Hospitals Deemed Disproportionate Share.—

(1) For purposes of subsection (a)(1), a hospital which meets the requirement of subsection (d) is deemed to be a disproportionate share hospital if—

(A) the hospital's medicaid inpatient utilization rate (as defined in paragraph (2)) is at least one standard deviation above the mean medicaid inpatient utilization rate for hospitals receiving medicaid payments in the State; or

(B) the hospital's low-income utilization rate (as defined in paragraph (3)) exceeds 25 percent.

for the defendants has represented to the court that SRS is in the process of developing a new definition of disproportionate share hospitals as required by OBRA–1987. It is entirely proper for the court to accept such a representation. *See DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974) (per curiam). In light of this new legislation, we must determine if a definite and concrete issue remains before the court.

In its claim for declaratory and injunctive relief, plaintiff has requested prospective relief only.[6] Since Bethany is seeking prospective relief only, serious questions of mootness are raised by the new legislation. OBRA–1987, by its terms, has put the duty on SRS to develop a new disproportionate share provision by July 1, 1988. Issuing an injunction ordering the state to do what Congress has already mandated would be a mere academic exercise and could not "affect the result as to the thing at issue in this case." *Metropolitan Transportation Auth. v. Federal Energy Regulatory Comm'n,* 796 F.2d 584, 595 (2d Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1286 94 L.Ed.2d 144 (1987). The same problem arises with plaintiff's request for a declaratory judgment. Any decision by this court on the plan's compliance or noncompliance with a federal law that has been substantially altered would have no current effect. A determination of the legal issues presented by the plaintiff is no longer necessary to compel the result plaintiff seeks. *See De-Funis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974) (per curiam). It would merely be an advisory opinion as to whether the state plan is valid *had Congress not amended the law* on the disproportionate share issue.

During closing arguments, plaintiff made several arguments as to why its claims (especially the request for a declaratory judgment) are not moot. First, Bethany argues that this court should "retain" jurisdiction to ensure that the state complies with OBRA–1987. It would seem that plaintiff is claiming that this case falls within the "capable of repetition, yet evading review" exception to the mootness doctrine.

■ The "capable of repetition, yet evading review" exception applies in cases where two elements can be established. First, the challenged action must be of a nature that is too short in duration to be fully litigated prior to its cessation or expiration. *New Jersey Turnpike Auth. v. Jersey Central Power & Light,* 772 F.2d 25, 31 (3d Cir.1985). In addition, the party seeking to avoid mootness must establish that there is a reasonable expectation that it would be subjected to the same action again. *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam). The court finds that Bethany has failed to establish that either of these factors exist in this case.

■ First, the action challenged by Bethany is not, by nature, of such a short duration to forestall full litigation. This is reflected by the fact that this action has been pending for almost three years. This is not a case involving a short-term contract or grant that is soon to expire. *See Campesinos Unidos, Inc. v. Department of Labor,* 803 F.2d 1063 (9th Cir.1986). Since the evidence shows that the state's Medicaid regulations remain comparatively stable, there is no reason to believe that full litigation of future challenges will be unavailable.

■ In addition, Bethany cannot establish that there is a reasonable expectation that it would be subjected to possibly unlawful reimbursement in the future. Plaintiff's bare assertion that the agency is likely to violate its rights in the future, without more, is insufficient to establish a present, live controversy. *Ashcroft v. Mattis,* 431 U.S. 171, 172–73 n. 2, 97 S.Ct. 1739, 1740 n. 2, 52 L.Ed.2d 219 (1977); *Blinder, Robinson & Co., Inc. v. S.E.C.,* 748 F.2d 1415, 1418 (10th Cir.1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985). Through the enactment of OBRA–1987, Congress has set minimum standards

---

6. Of course, the court recognizes that plaintiff's request for prospective relief only was necessitated by the State's eleventh amendment immunity in federal court.

for the designation of and adjustments given to disproportionate share hospitals for Medicaid purposes. Since the state's discretion on this issue has been limited by the legislation, the likelihood of abuse by the agency is greatly reduced. Furthermore, the court refuses to presume that Dr. Barton and his agency will fail to comply with the terms of OBRA–1987. It is presumed that administrative agencies will act within the law. *Blinder, Robinson & Co., Inc. v. S.E.C.,* 748 F.2d at 1418.

We also reject plaintiff's argument that the state has established a pattern of noncompliance with federal Medicaid requirements. Several years ago, the Kansas Supreme Court found that SRS had failed to comply with federal law as it pertained to cost-based reimbursement for long-term care facilities.[7] One incident, however, does not create a "pattern of noncompliance." Furthermore, since the court has not ruled on plaintiff's claims that SRS has violated the disproportionate share provisions, Bethany cannot raise this action as evidence of noncompliance.

Finally, the court notes that the evidence has been taken in this case and the matter has been submitted for ruling. Plaintiff's request that we retain jurisdiction to evaluate the defendants' future conduct is clearly beyond the scope of this action. The evidence adduced in this case has little or no relevance to a possible future challenge to the state Medicaid plan as it pertains to disproportionate share hospitals. To retain jurisdiction would allow plaintiff to begin all over again before the agency has even attempted to comply with OBRA–1987. Such an action would be premature.

For these reasons, the court rejects plaintiff's argument that we should retain jurisdiction to monitor SRS' future compliance with federal disproportionate share legislation. Should plaintiff decide to challenge the Kansas Medicaid Plan after the new disproportionate share amendments are implemented, it may file a new action and proceed with discovery on that issue.

A second argument is made by Bethany to avoid the question of mootness. Plaintiff contends that the claim for declaratory relief is still "alive" because a favorable declaratory judgment could be used in state court by plaintiff to recover monetary damages for past reimbursement payments. Bethany has cited no authority for this proposition. The court rejects this contention for two reasons. First, nothing in the record reflects that plaintiff ever intended to take a declaratory judgment in its favor to state court to obtain monetary damages. During arguments, plaintiff only indicated that it was *considering* such an action. A party cannot avoid the constitutional requirement of an active "case or controversy" by saying that it "might" take a judgment on an otherwise moot issue to state court for other relief. *See General Elec. Co. v. Local 761, Int'l Union of Elec., Radio & Machine Workers,* 395 F.2d 891, 893–94 (6th Cir.1968).

Even if we ruled in plaintiff's favor on its request for declaratory judgment, Bethany has failed to show that such a judgment would entitle it to monetary damages. Under the existing state Medicaid plan, Bethany would be entitled to more reimbursement only if it proved that it was a disproportionate share hospital. Thus, to recover past damages, plaintiff would need not only a judgment that the state disproportionate share provisions were invalid, but it would also need a determination that it was, in fact, a disproportionate share hospital.

Even if we determined that the current plan is arbitrary and capricious in its definition of "disproportionate share," that does not automatically make Bethany a disproportionate share hospital. The legislative history of OBRA–1981 clearly indicates that Congress intended to give the states extremely broad discretion in establishing their medicaid reimbursement plans. While we could determine whether the Kansas plan complies with section 1395a(a)(13)(A) by taking into account hos-

---

**7.** *See Country Club Home, Inc. v. Harder,* 228 Kan. 756, 620 P.2d 1140 (1980), *modified,* 228 Kan. 802, 623 P.2d 505 (1981).

pitals that serve a disproportionate number of low income persons, "probing beyond this bottom line to the underlying ratesetting methodology is not required." *Colorado Health Care Ass'n v. Colorado Dept. of Social Serv.*, 842 F.2d at 1166; *Coalition of Michigan Nursing Homes, Inc. v. Dempsey*, 537 F.Supp. 451, 459 (E.D.Mich. 1982). Making a determination that Bethany is a disproportionate share hospital not only interferes with the agency's discretion, but we would be stepping into a process in which we have no expertise. At closing arguments, plaintiff's counsel conceded that this court would be interfering with the discretion given the states in OBRA–1981 if we issued such a declaration. Absent such a determination, it is unclear how plaintiff would be entitled to monetary damages in state court.

In this situation, the court finds that plaintiff's claim for declaratory relief does not constitute an actual "case or controversy" as required by Article III. Plaintiff is only "considering" the possibility of taking a favorable declaratory judgment to state court. In any event, a declaration that the state Medicaid plan is invalid, by itself, would not entitle Bethany to damages. Such speculative future events do not warrant deciding a claim that is otherwise moot.

■ Finally, plaintiff also seems to argue that its claims are not moot due to its pending claim for attorney's fees pursuant to 42 U.S.C. § 1988. Of course, without a determination on the merits, plaintiff has difficulty in proving that it is a "prevailing party." However, the presence of a claim for attorney's fees does not shield claims that are otherwise moot. This issue was best described by the Fourth Circuit in *LaFaut v. Smith*, 834 F.2d 389 (4th Cir. 1987):

> Although it might be argued that appellant retained an interest in receiving a declaratory judgment so as to be a prevailing party for purposes of receiving an award of attorney's fees ..., this is not the kind of interest that can prevent an otherwise moot claim from being moot. Because the fee may be awarded

only to the prevailing party, to allow this interest to prevent the claim itself from being moot would be a boot strap. The awarding of fees ... is not compensation for the injury incurred, but rather it is a consequence of prevailing on the "case or controversy" before the court. It would be inappropriate to conclude that a "case or controversy" existed merely in order to permit the awarding of fees to a party for prevailing on a moot issue.

*Id.* at 395 n. 10. This holding was implicitly accepted by the Tenth Circuit in *Operating Eng. Local Union No. 3 v. Bohn*, 737 F.2d 860, 863 (10th Cir.1984). The court finds this reasoning sound and adopts it. Therefore, the presence of the claim for attorney's fees under section 1988 does not affect the mootness of the demand for declaratory and injunctive relief.

For all of the above reasons, the court finds that plaintiff's claims for declaratory and injunctive relief have been rendered moot by the enactment of OBRA–1987. To issue a decision on the validity of the state's disproportionate share provisions would be a mere academic exercise and would have no effect in compelling the result plaintiff has sought. The court recognizes that the parties have expended considerable time and money in preparing this case. We also note that the substantive issues raised are of great public interest. However, these factors do not create an active "case or controversy." *New Jersey Turnpike Auth. v. Jersey Central Power & Light*, 772 F.2d 25, 30 (3d Cir.1985). Since there is no "subject matter upon which [a] judgment of the court can operate," we must decline to determine the substantive merits of the claims. *Id.* Therefore, plaintiff's claims against Dr. Winston Barton in his official capacity as Secretary of the Department of Social and Rehabilitation Services are hereby dismissed as moot.

IV. *Claim for Monetary Damages.*

■ The second claim asserted by the plaintiff is for monetary damages against Dr. Robert Harder in his individual capacity. Plaintiff claims that Dr. Harder, while

Secretary of SRS, violated its constitutional and statutory rights to appropriate Medicaid reimbursement by implementing the existing Kansas Medicaid Plan. Bethany alleges that Dr. Harder committed these violations by sending assurance letters to HCFA stating that the Kansas plan was in compliance with OBRA–1981. Dr. Harder contends that he is immune from liability under section 1983.

The doctrine of qualified immunity [8] provides that "government officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Tenth Circuit has recently set forth the steps necessary to establish the defense of qualified immunity, which we summarized in an order issued earlier in this action:

> First, the defendant must properly raise the defense, *i.e.*, he must assert that he was performing discretionary functions. *Id.* at 342. Plaintiff then has the burden to convince the court that the law relied upon by plaintiff was clearly established at the time the defendant allegedly deprived plaintiff of his civil rights. *Id.* at 342–43. If the plaintiff fails to convince the court that the law was clearly established, the defendant is qualifiedly immune and the court must enter judgment in favor of the defendant who has pleaded the defense. *Id.* at 343. If, on the other hand, the plaintiff convinces the court that the law was clearly established, the court must proceed to determine whether the defendant has raised a fact issue as to whether "exceptional circumstances" exist such that a reasonable person in his position would not have known of the relevant legal standard. *Id.* If the defendant raises such a fact issue, the defendant is entitled to a jury instruction on the defense. If not, the defendant is not entitled to the defense as a matter of law. *Id.*

*Bethany Medical Center v. Harder*, No. 85–2415 (D.Kan., *unpublished*, March 12, 1987) (citing *Lutz v. Weld County School Dist.*, 784 F.2d 340, 342–43 (10th Cir.1986)).

Bethany first contends that Dr. Harder's actions were ministerial in nature rather than discretionary, thus barring the qualified immunity defense. The Supreme Court has recognized that qualified immunity is necessary to protect officials performing discretionary functions from "undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. at 806, 102 S.Ct. at 2732. The Court has also recognized that the higher the position held by an official, "the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails." *Scheuer v. Rhodes*, 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974) (quoting *Barr v. Matteo*, 360 U.S. 564, 573–74, 79 S.Ct. 1335, 1340–41, 3 L.Ed.2d 1434 (1959)).

In this case, plaintiff contends that Dr. Harder was performing a ministerial function when he sent the assurance letters to HCFA. This "ministerial" argument seems to have two bases. First, plaintiff contends that no discretion is involved since providing the assurance letter is mandated by federal regulation. *See* 42 C.F.R. § 447.253 (1986). In addition, plaintiff emphasizes that the assurance letters were sent after the Kansas Medicaid plan was finalized. Since the plan was completed,

---

**8.** In their briefs, the parties have made reference to Dr. Harder's immunity under the Kansas Tort Claims Act (KTCA), K.S.A. 75–6101 *et seq.* A party bringing an action against the state or state employee *under the KTCA* cannot bring the action in federal court; the KTCA has not waived the state's immunity under the eleventh amendment. *Billings v. Wichita State Univ.*, 557 F.Supp. 1348, 1350 (D.Kan.1983).

However, this action is brought under *federal* law rather than the KTCA. This court has previously determined that federal civil rights claims are not subject to the limitations on liability under the KTCA. *Lee v. Wyandotte County, Kan.*, 586 F.Supp. 236, 239 (D.Kan. 1984).

Our rejection of defendant's defense under state law does not preclude us from considering Dr. Harder's claim for qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Harder's actions were no longer discretionary.

The court rejects both of these arguments. Plaintiff has attempted to cloak its true claims in a guise of ministerial activity. However, Bethany's claims are not, in reality, based on Dr. Harder's compliance with federal regulations when making the assurances. Plaintiff's complaint is with the *content* of the assurance letters—*i.e.*, statements assuring that the Kansas plan complied with federal law and that there were no disproportionate share hospitals in Kansas. These assurances are inherently and inextricably tied to the substance of the plan designed and implemented by Dr. Harder and his staff. The plaintiff does not dispute that Harder's actions in *developing* the reimbursement methodology were discretionary. Since his actions in designing the state plan were discretionary rather than ministerial, the assurances made by Dr. Harder must also be considered discretionary. Thus, the defendant is entitled to raise the *Harlow* qualified immunity defense.

 Since Dr. Harder has properly raised the qualified immunity defense, Bethany has the burden to prove that Harder's actions violated some clearly established standard. After a careful review of all the evidence, we must find that Dr. Harder's conduct in designing and implementing the Kansas Medicaid Plan did *not* violate any clearly established standard in regard to the disproportionate share issue.

When OBRA–1981 was enacted, Congress was clearly concerned with giving the states greater flexibility in designing Medicaid reimbursement plans. This flexibility was needed, in Congress' view, to avoid the inherently inflationary nature of cost-based reimbursement and to encourage efficiency and economy in providing medical services to the poor. *See* H.R.Rep. 97–158, at 292–93; S.Rep. 97–139, at 478, 1981 U.S.Code Cong. & Admin.News 744. On the other hand, Congress recognized that giving the states such discretion might lead to arbitrary and unreasonable reimbursement methodologies. *See* H.R.Rep 97–158, at 294; S.Rep. 97–139, at 478, 1981 U.S.Code Cong. & Admin.News 744. The

House of Representatives was especially concerned that the abandonment of cost-based reimbursement would damage hospitals serving large numbers of low income patients, since they often were extremely dependent on Medicaid and other government programs. The House feared that such an impact would force some providers to drop out of the Medicaid program for financial reasons. This led to the inclusion of the disproportionate share language in OBRA–1981. *See* H.R.Rep. 97–158, at 294.

While Congress adopted the disproportionate share language, it was far from clear what specific types of hospitals it was concerned about. In the report from the House, only two examples of disproportionate share hospitals were mentioned. These hospitals received 47 percent to 51 percent of their overall revenues from the Medicaid and Medicare programs. In addition, all but 10 percent to 12.5 percent of these hospitals' revenues came from government funding. H.R.Rep. 97–158, at 295. In the report of the Conference Committee, the conferees expressed concern about *"public and teaching* hospitals which serve a large Medicaid and low income population [that] are particularly dependent on Medicaid reimbursement."* Conf.Rep. 97–208, at 962, 1981 U.S.Code Cong. & Admin.News 1324 (emphasis added). From this legislative history, it is evident that Congress did not establish a clear standard for defining disproportionate share hospitals. Furthermore, the legislative history fails to reflect any clear guidelines telling the states how to "take into account" such hospitals.

The lack of clarity in the Congress mandate is reflected by the actions of the federal agency assigned to oversee the Medicaid program. In both the interim and final rules issued by HCFA after OBRA–1981 was enacted, the agency repeatedly emphasized that states were given flexibility to develop plans that met the disproportionate share provisions. *See* 46 Fed.Reg. 47964, 47970 (1981); 48 Fed.Reg. 56046, 56048 (1983). In enacting its final rules under OBRA–1981, HCFA expressly rejected requests by some commentators that the agency establish a single definition or stan-

dard of a "disproportionate share" facility. Due to Congress' desire to give greater flexibility to the states, HCFA refused, stating that "imposing a specific definition for 'disproportionate numbers * * *' would be contrary to this intent." 48 Fed. Reg. at 56048.

Finally, the fact that no clear standard existed on the disproportionate share issue is reflected by the diversity among the states' Medicaid plans. In the report he furnished Congress in 1986, Secretary Bowen of the Department of Health and Human Services described the various methodologies used by the states. He reported that twenty-seven states had incorporated into their payment methods and standards a definition of "disproportionate" hospitals and mechanisms for a rate adjustment for such hospitals; however, these definitions and adjustments varied widely. Furthermore, the report indicated that twenty-three states had reimbursement systems that "automatically" accounted for costs attributable to the special needs of low-income patients. (Plaintiff's Exhibit 36.) In light of all this evidence, the court can only conclude that during Dr. Harder's tenure as Secretary of SRS, there was no clearly established standard for the requirement of "taking into account" disproportionate share hospitals.

■ The court recognizes that plaintiff presented evidence of the treatment of the disproportionate share issue in the Medicare program. However, we are not persuaded that the treatment of the disproportionate share issue in that program has much relevance to this litigation. The Medicare program is substantially different than Medicaid in its methods of reimbursing covered expenses. Medicare is a *federally-implemented* program which reimburses hospitals based on a complex formula composed of two major factors: a factor based on a national DRG rate and a hospital-specific factor. Through the enactment of the Consolidated Omnibus Reconciliation Act of 1985 (COBRA–1985), Congress abro-

gated cost-based reimbursement under the program. Pub.L. No. 99–272. Furthermore, COBRA–1985 provided that specified adjustments be made to hospitals that served a disproportionate share of low income patients; these adjustments were made only to the national DRG factor of the reimbursement formula. The legislation also required the Department of Health and Human Services to promulgate a definition of "disproportionate share" for the Medicare program. Although a national standard of "disproportionate share" in the Medicare program was established,[9] Congress made no effort to extend that definition to the Medicaid program.

■ Similarly, in the enactment of OBRA–1987, Congress expressed much indignation at the states' "shocking noncompliance" with the disproportionate share requirements of OBRA–1981. However, Congress' view that the states had failed to comply has little relevance to the issue of whether there was a clearly established standard *at the time Dr. Harder was Secretary of SRS.* While Congress was shocked by the states' "noncompliance," it failed to give the states any clear guidelines or standards to use in complying with section 1396a(a)(13)(A).

Nor is the court convinced that Dr. Harder violated any clearly established standard when he approved the 1983 reimbursement methodology, which did not contain specific definitions of "disproportionate share hospital" or "low income patient." Section 1396a(A)(13)(A) merely required states to "take into account" disproportionate share facilities when they develop their reimbursement methodologies. Nothing in the statute requires that the states establish their own definitions of these terms *in their plans.* Kansas was one of a number of states that developed plans that were considered to "automatically" take into account the special costs of disproportionate share hospitals. Furthermore, evidence established that the SRS officials who were

---

9. Congress itself developed the standards for disproportionate share hospitals under Medicare. *See* Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, § 9105, 100 Stat. 158. Congress was forced to step in after the administrative agency (HCFA) repeatedly failed to develop the standards as directed by Congress.

directly involved in the day-to-day design and development of the Kansas plan had general definitions for these terms in mind. The evidence utterly fails to establish a clear standard as to the actions challenged by the plaintiff.

For all these reasons, the court finds that Dr. Harder is entitled to qualified immunity for his actions in developing and implementing the state Medicaid plan and in making assurances to HCFA in regard to that plan. At the time he was Secretary, there was no clearly established standard for the definition of disproportionate share hospitals or for the adjustments which such hospitals should receive.

## V. Claim for Attorney's Fees.

■ The final claim made by the plaintiff is for attorney's fees pursuant to 42 U.S.C. § 1988. This section provides:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title ..., the court, in its discretion, may allow the *prevailing party*, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988 (emphasis added). A plaintiff in a civil rights case must receive at least some relief on the merits of his claims before he can be said to be a prevailing party eligible for attorney's fees. *Hewitt v. Helms,* — U.S. —, —, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654, 661 (1987).

Courts have repeatedly recognized that the right to attorney's fees is not conditioned upon a judicial determination on the merits of the party's claims. *See, e.g., Smith v. Robinson,* 468 U.S. 992, 1006, 104 S.Ct. 3457, 3465, 82 L.Ed.2d 746 (1984). Courts have awarded attorney's fees in appropriate circumstances when the claims were extinguished by a settlement or were resolved on a nonconstitutional issue. *Id.* Likewise, attorney's fees can be awarded when a consent decree is entered, *J & J Anderson, Inc. v. Town of Erie,* 767 F.2d 1469, 1475 (10th Cir.1985), or when an action of the defendant moots the issues, *Williams v. Leatherbury,* 672 F.2d 549, 551 (5th Cir.1982).

■ When the civil rights issues raised by the plaintiff are not addressed by the court because of mootness or some other issue, it is not immediately apparent whether the plaintiff could be considered a "prevailing party." To resolve this issue, the courts apply a two-step "catalyst test" originated by the First Circuit in *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978). In this situation, a plaintiff is considered to be a "prevailing party" only if he shows (1) that his action is causally linked to the relief obtained, *and* (2) the defendant's conduct in response to the lawsuit was required by section 1983. *Supre v. Ricketts,* 792 F.2d 958, 962 (10th Cir.1986); *J & J Anderson, Inc. v. Town of Erie,* 767 F.2d 1469, 1475 (10th Cir.1985).

In this case, plaintiff cannot qualify as a prevailing party. Bethany's claims for prospective declaratory and injunctive relief have been mooted by Congress' enactment of OBRA–1987. Thus, to be considered a prevailing party, Bethany must satisfy the catalyst test. There is no evidence that this litigation is in any way causally connected with the enactment of OBRA–1987. Furthermore, plaintiff conceded that it was not involved in any lobbying efforts toward the passage of that legislation. Bethany also has failed to satisfy the second prong of the catalyst test, since the action mooting the issues was by Congress rather than the defendants. Finally, the court has ruled against the plaintiff's claims for monetary damages against Dr. Harder in his individual capacity, so plaintiff cannot be considered to be a prevailing party on that claim. Consequently, plaintiff's claims for attorney's fees pursuant to 42 U.S.C. § 1988 must be denied.

IT IS THEREFORE ORDERED that plaintiff's claims for declaratory and injunctive relief against Dr. Winston Barton in his official capacity are dismissed as moot.

IT IS FURTHER ORDERED that judgment be entered in favor of the defendant on plaintiff's claim for monetary damages against Dr. Robert C. Harder in his individual capacity.

IT IS FURTHER ORDERED that judgment be entered in favor of the defendants on plaintiff's claims for attorney's fees under 42 U.S.C. § 1988.