In re SAINT JOSEPH'S
HOSPITAL, Debtor.

SAINT JOSEPH'S HOSPITAL and
Official Unsecured Creditors'
Committee, Plaintiffs,

v.

DEPARTMENT OF PUBLIC WELFARE
OF the COMMONWEALTH OF PENN-
SYLVANIA, John F. White, Jr., in his
official capacity of Secretary of Public
Welfare, Eileen M. Schoen, in her offi-
cial capacity as Deputy Secretary for
Medical Assistance, David S. Feinberg,
in his official capacity as Director of
the Bureau of Policy and Program De-
velopment of the Office of Medical As-
sistance, and David D. Ulsh, in his offi-
cial capacity as Acting Director of the
Division of Inpatient Programs of the
Office of Medical Assistance, Defen-
dants.

Bankruptcy No. 88–14005S.
Adv. No. 89–0319S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 21, 1989.

Joseph A. Dworetzky, Amy L. Banse, Drinker Biddle & Reath, Philadelphia, Pa., for debtor/plaintiff.

Bruce G. Baron, Asst. Atty. Gen., Harrisburg, Pa., for defendants.

Andrew J. Napoli, Pincus, Bressler, Hahn, Reich & Weinberg, P.C., Philadelphia, Pa., for plaintiff/creditors' committee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION.

This complex adversary proceeding challenges three aspects of the determinations of the Medicaid reimbursement due to Debtor-hospital by the applicable state agency in Funding Year (hereinafter "FY") 1987 and FY 1988 in five separate Counts. Presently before us in this proceeding are (1) The Debtor's motion for partial summary judgment as to three of the Counts; and (2) the Defendants' motion to dismiss, based upon the Eleventh Amendment.

We conclude that the motion to dismiss must be denied because the Commonwealth has abrogated its Eleventh Amendment protections by filing proof of claims, albeit through agencies different from that named as a defendant herein. We also conclude that the Debtor is entitled to relief, at this juncture, only as to one aspect of its Complaint, which the Defendants now concede in substance, but contend, contrary to our conclusions, need not be decided because it is moot. We also conclude that the Debtor could succeed only on its claims set forth in Counts IV and V of its Complaint, asserting violations of Title XIX of the Social Security Act and 42 U.S.C. § 1983. We reject and therefore dismiss the claim set forth in Count I, asserting violations of the parties' Provider Agreement. We also reject the Defendants' contention that the Debtor lacks standing to prosecute any aspects of its claims. However, we decline to provide any relief as to the remaining two aspects of the Debtor's claims on the instant record, believing that further evidence of the Debtor's circumstances, including the "efficiency" and "economy" of its operations, and of the process utilized by the Defendants in formulating its current Regulations and procedures, including consideration of available alternatives, is necessary before we can do so.

### B. PROCEDURAL HISTORY AND BASIC UNDERLYING FACTS.

The Debtor, SAINT JOSEPH'S HOSPITAL, is a 178–bed full-service hospital owned and operated by the Catholic Order of Felician Sisters, located at 16th Street and Girard Avenue in north central Philadelphia. As the 1980's have resulted in the further deterioration of poor Black communities, north central Philadelphia has been one of the most severely-impacted of such areas. Despite the declining economic structure of its neighborhood, the Debtor opted to remain and rebuild in this area after a devastating fire to its facility in August, 1977. We have no reason to doubt the Debtor's contention that the decision to remain in this community was motivated by the Felician Sisters' perception of the presence of an overwhelming need in this community, particularly in light of the recent flight of the other hospitals formerly located there.

The decline of its neighborhood has caused the Debtor's patients to be increasingly dependent on Medicare, a program specially designed to cushion medical costs of the aged and disabled which is administered directly by the federal government; and Medicaid, a program designed to assist other medically-needy, low-income persons. The Medicaid program, as described in more detail in the following paragraph, is largely financed with federal funds, but is partially funded and administered by state agencies, in this state by the Defendant COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE (hereinafter "DPW"). On July 1, 1977, the Debtor and DPW executed a form MEDICAL ASSISTANCE PROGRAM INPATIENT HOSPITAL CARE AGREEMENT (herein "the Provider Agreement"). The Provider Agreement states, *inter alia,* as follows:

C. DEPARTMENT'S RESPONSIBILITIES

The Department agrees to:

.    .    .    .    .

4. Pay to the Hospital the reasonable costs for services rendered under this Agreement as determined by the regulations adopted under Title XIX of the Federal Social Security Act and in accordance with regulations of the Department.

This lawsuit involves a dispute as to the Debtor's reimbursement from Medicaid funds, as opposed to Medicare funds. *Compare, e.g., In re University Medical Center*, 93 B.R. 412 (Bankr.E.D.Pa.1988); and *In re St. Mary Hospital*, 89 B.R. 503 (Bankr.E.D.Pa.1988) (involving only setoff procedures of the *federal* government in administration of the *Medicare* program). Some further description of the Medicaid program and the changes in its administration relevant to this proceeding must be set forth to provide an understanding of this lawsuit.

Medicaid is a program established by the federal government to provide adequate health care to eligible low-income persons and to alleviate the formation of a two-tier system of health care in this country. It is "a cooperative endeavor in which the Federal Government provides financial assistance to participating states to aid them in furnishing health care to needy persons." *Harris v. McRae*, 448 U.S. 297, 308, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980). The program is jointly funded by the federal and state governments, with the federal share for each state dependent on its per capita income. 42 U.S.C. § 1396d(b). States participating in Medicaid must provide "medical assistance plans," which must conform to federal law and federal regulations. Title XIX of the Social Security Act, 42 U.S.C.A. § 1396a; and 45 C.F.R. § 302.0, *et seq.* Pennsylvania has elected to participate in Medicaid and has adopted a medical assistance plan, by statute, Public Welfare Code, Art. IV(f), 62 P.S. § 441, *et seq.;* and by regulation, 55 PA.CODE § 1101, *et seq.*

Execution of a Provider Agreement is a prerequisite for participation in the Medicaid program by any provider. Through the mid–1980's, DPW reimbursed the reasonable costs of provider hospitals on a hospital-specific basis. That is, the "reasonableness" of each hospital's costs was determined by reference only to that hospital, and hospitals were generally reimbursed in accordance with their actual costs. Subsequently, Congress enacted the Medicare and Medicaid Amendments of 1980, including the Boren Amendment, codified at 42 U.S.C.A. 1396a(a)(13)(A), which reads as follows:

§ 1396a. State plans for medical assistance

(a) Contents

A State plan for medical assistance must—

.    .    .    .    .

(13) provide—

(A) for payment (except where the State agency is subject to an order under section 1396m of this title) of the hospital, skilled nursing facility, and intermediate care facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State and *which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs and provide, in the case of hospital patients receiving services at an inappropriate level of care* (under conditions similar to those described in section 1395x(v)(1)(G) of this title), *for lower reimbursement rates reflecting the level of care actually received* (in a manner consistent with section 1395x(v)(1)(G) of this title) *which the State finds,* and makes assurances satisfactory to the Secretary, *are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services* in conformity with applicable State and

Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the secretary, for the filing of uniform cost reports by each hospital, skilled nursing facility, and intermediate care facility and periodic audits by the State of such reports; ... (emphasis added).

The Boren Amendment was thus intended to control ever-increasing health care costs by penalizing hospitals that operated inefficiently and rewarding those that operated efficiently and economically and, as indicated, requires that State plans "take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A).

In an attempt to comply with the Boren Amendment, DPW changed its medical assistance program so that hospitals were assigned to groups of similarly situated hospitals, and each hospital was reimbursed only for the reasonable costs incurred by the average hospital in its group. This method, known as a prospective payment system, was designed to reward "efficient" hospitals with more Medicaid reimbursements than they actually expended and to cause "inefficient" hospitals to incur a deficit. In that way, "inefficient" hospitals would have an incentive to become more efficient and economical, thus accomplishing Congress's purpose. Hospitals which were forced to spend more on health care than they received in Medicaid reimbursements would have to make up the deficit from other sources, such as from self-paying and commercially insured patients and from endowments or charitable gifts. *See generally Bethany Medical*

*Center v. Harder,* 693 F.Supp. 968, 971–73 (D.Kan.1988).

The change from a hospital-specific reimbursement system to a prospective payment system was phased in over three years. Thus, in FY 1985, twenty-five (25%) percent of the hospital's reimbursement was based on average group costs and seventy-five (75%) percent on hospital-specific costs; in FY 1986, the balance was 50%–50%; in FY 1987, it was 75%–25%; and in FY 1988 and thereafter, it was to be 100%–0%.

The Debtor filed an administrative appeal from DPW's calculation of its reimbursements due to the Debtor in each of these four fiscal years from FY 1985 and thereafter. The FY 1985 and FY 1986 appeals have been settled. The FY 1987 and FY 1988 appeals are in issue here. The Debtor has joined with numerous other hospitals in Pennsylvania to challenge the FY 1989 system in *Albert Einstein Medical Center v. White,* C.A. No. 88–8831 (E.D.Pa.).[1] The Debtor desires, in this proceeding, to resolve only the adequacy of its FY 1987 and FY 1988 reimbursements.

As we indicated at the outset, there are three aspects of the Debtor's challenge to its reimbursements in the 1987 and 1988 FY's. To understand these challenges, it is necessary to understand DPW's methodology for reimbursement of Medicaid to hospitals in the FY's in issue. Reimbursement of 229[2] of Pennsylvania's hospitals is established by a complicated formula that involves five basic steps: (1) classification of all Medicaid participating hospitals (other than childrens' hospitals) into one of seven groups; (2) calculation of an average cost per case of each hospital within each group, based on the historic operating costs of each hospital; (3) calculation of a "group average cost per case" based on the average cost per case of each specific hospital in the group; (4) calculation of a "relative value" of each diagnosis related group (hereinafter "DRG") by dividing the state-

---

**1.** The Debtor claims that "250" hospitals are prosecuting this case. The dockets of this and a related case, *Temple University v. White,* C.A. No. 88–6646 (E.D.Pa.), appear to name only 15 hospitals.

**2.** This is apparently the number of all hospitals providing acute care-services in the Commonwealth.

wide average cost for treating a particular DRG by the statewide average cost of treating all DRG's; and (5) multiplying the group average cost per case by the relative value of the DRG. 55 PA.CODE § 1163.121.

The methodology of grouping is effected on the basis of four "concepts:" (1) teaching status; (2) Medicaid volume; (3) environmental characteristics; and (4) hospital costs. 55 PA.CODE § 1163.131. To transform these theoretical concepts into values that can be evaluated in a quantitative fashion, the following 13 variables are used:

*Teaching Concept*

1. number of different medical and osteopathic residency programs
2. number of full time equivalent (FTE) physician residents and interns
3. number of FTE physician residents and interns per bed

*Medicaid Volume Concept*

4. Medicaid reimbursable inpatient costs
5. Medicaid reimbursable inpatient costs divided by total inpatient costs
6. total Medicaid inpatient days
7. total Medicaid inpatient days divided by total inpatient days

*Environmental Characteristics Concept*

8. percent of persons below the poverty line (county level data)
9. median family income (county level data)
10. percent unemployment (county level data)

*Hospital Costs Concept*

11. Medicare area wage index
12. Inpatient expenses adjusted for direct medical education, capital and physician professional component divided by total inpatient admissions.
13. Inpatient expenses adjusted for direct medical education, capital and physician professional component divided by total inpatient days.

55 PA.CODE § 1163.121.

The three aspects of the Debtor's challenge to this process, as applied to it, are as follows: (1) The Debtor was improperly classified in Group 2 of the seven groupings instead of Group 1, due to DPW's refusal to consider its residential podiatry programs in factoring of the "teaching concept." This difference in classification resulted in a difference of $3,027,800 in reimbursements allowed for the two years in issue. This is the one aspect of the Debtor's Complaint of which DPW no longer contests the substance. Rather, in its Answer to the Debtor's Motion for Summary Judgment, DPW concedes that it should have considered the Debtor's podiatry program in its "teaching concept" calculus and that, upon its now doing so, the Debtor is entitled to placement in Group 1. However, as is indicated at pages 653–54 *infra,* a dispute apparently still exists in determining how this reimbursement deficiency will be made up to the Debtor. (2) On October 11, 1986, DPW amended its Regulations to establish a cost-payment cap for reimbursement of direct medical education (hereinafter "DME") costs at the levels established in FY 1985. The Debtor has initiated new DME internship programs, which it believes are necessary to attract physicians to its undesirable location. The Debtor contends that this cap has resulted in disallowance of reimbursement for these costs and a deficiency of reimbursement in the total amount of $240,809 in FY 1987 and $502,697 in FY 1988, or a total of $743,506 for both years. (3) The Debtor argues that DPW's exclusive reliance on the grouping concept for determining reimbursement rates, without allowing exceptions for hospitals which undertake to serve a hugely "disproportionate number of low income patients with special needs," fails to comply with the Boren Amendment. While the Debtor does not quantify the losses suffered from this aspect of DPW's procedures, we note that the Debtor lost $3,165,357 in servicing Medicaid patients in FY 1987 and $3,972,840 in servicing Medicaid patients in FY 1988. Presum-

ably, the Debtor seeks reimbursement of the portion of the $7,148,197 total loss not already remedied by the sustaining of its contentions as to the other two aspects of its claims. This aspect of the Debtor's claims is, thus, the most far-reaching and significant of its challenges, from both a conceptual and a monetary perspective.

The instant litigation began with the Debtor's administrative appeals of DPW's reimbursements to it in both FY 1987 and FY 1988. The parties agreed to consolidate these appeals, and the record from the FY 1985 and FY 1986 appeals was incorporated into the record of the FY 1987 and FY 1988 appeals. The first procedural stage in the consolidated 1987–1988 appeals was a hearing before an "Attorney Examiner" (hereinafter "AE") on October 1, 1987. On November 29, 1988, shortly after the Debtor's bankruptcy filing, the AE issued a lengthy (30–page) Adjudication, recommending that the appeal be granted as to the misgrouping of the Debtor in Group 2 and relief from the DME cap (the first and second aspects of the Debtor's appeal), but denied as to the third, broader aspect. At the next administrative stage, i.e., review of the AE's Adjudication by the Director of DPW's Office of Hearings and Appeals, the AE's recommendation was, in a half-page Order of December 21, 1988, adopted as to aspect one (the misgrouping) and aspect three (the general attack on grouping), but not adopted as to the second aspect (the DME challenge, on which the Debtor had been successful before the AE). The Debtor requested reconsideration of the disposition of the two issues on which DPW ultimately prevailed, and DPW requested reconsideration of the issue on which the Debtor prevailed. On January 20, 1989, the Secretary of DPW granted both requests for reconsideration, but never issued a final Order.

By Order of February 24, 1989, in the Debtor's main bankruptcy case, we enlarged, to May 15, 1989, the 90–day time-period, see Bankruptcy Rule (hereinafter "B.Rule") 9027(a)(2)(A), which the Debtor normally would have to seek removal of any litigation in which it was involved in other forums to this court. On April 10, 1989, the Debtor purported to remove the aforesaid pending administrative appeal before DPW to the Middle District of Pennsylvania and simultaneously move to transfer the venue of that matter to this court. On the same date, the Debtor also filed the instant new proceeding in this court. By a Stipulation of the parties approved by this court on May 16, 1989, the Application for removal was withdrawn without prejudice, and it was agreed that the parties would litigate only this proceeding. They also agreed that this proceeding was core in nature and that this court would be empowered to decide it.[3] The parties also agreed that the entire record from the administrative proceeding would be incorporated into the record here.

Although the Complaint raises the three aspects of the Debtor's disputes with the DPW reimbursement decisions discussed at pages 647–48 supra, it is broken into five separate Counts, each of which is alleged to be applicable to all three aspects. Count I, entitled Breach of Contract, alleges that DPW's reimbursement policies violate the Provider Agreement. Count II asserts that DPW violated 11 U.S.C. §§ 362 and 553 of the Bankruptcy Code by seeking reconsideration of the first aspect of the Debtor's challenge, which had been decided favorably to the Debtor at the administrative level, and attempting to set off its liability under the decision's favorable aspects without first obtaining relief from the automatic stay. Count III seeks a turnover of funds due to the Debtor from DPW under 11 U.S.C. § 542(b). Count IV alleges that DPW's practices for determining its levels of reimbursement violate "the Medicaid Act," presumably 42 U.S.C. § 1396a(a)(13)(A), i.e., the Boren Amendment. Count V alleges a violations of the Debtor's federal rights by DPW under 42

---

3. Therefore, the parties have irrevocably expressly consented that we hear and determine this matter. See 28 U.S.C. § 157(c)(2); B.Rule 7012(b); and In re St. Mary Hospital, Bonner v. Hiser, 101 B.R. 451, 454, 457–58 (Bankr.E.D.Pa. 1989).

U.S.C. § 1983 based upon its alleged violations of the Boren Amendment.

This matter was listed for trial on May 31, 1989. On that date, we approved the parties' Stipulation reciting that the matter would be presented to us by the Debtor's filing a motion for summary judgment and supporting argument on or before June 19, 1989; the Defendants' response on or before July 12, 1989; and the Debtor's reply on or before July 19, 1989.

Accordingly, on June 19, 1989, the Debtor filed its motion for partial summary judgment, requesting that it be awarded monetary, declaratory, and injunctive relief as to all aspects of Counts I, IV, and V of the Complaint. Filed simultaneously with the Motion were Affidavits of Timothy Churchill, the Debtor's Executive Director; and Sister Mary Rosita, a Felician Sister and the Assistant Administrator of the Debtor. Also filed were two thick volumes (totalling 708 pages) of documents in support of the Motion. These consist of portions of testimony, depositions, and certain exhibits which were apparently presented to the AE in the administrative appeals before DPW. Diverse other documents are, however, also contained therein, including the administrative decisions from the appeals for FY 1985 and FY 1986, a partial transcript of a 1983 Commonwealth Court proceeding, copies of pertinent Regulations, and copies of certain pleadings filed in this proceeding. We doubt (and neither party has enlightened us on this point) that the entire record from the administrative proceeding before DPW for FY 1985 through FY 1988 is included therein, although neither party has undertaken to supply us with any other portions of that record. We are certain that these documents include materials which were not part of that record.

On June 23, 1989, four days after the Debtor filed its initial submission, the Supreme Court handed down its decision in *Hoffman v. Connecticut Dep't of Income Maintenance*, — U.S. —, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989). Expressly declining to follow the previous law of this Circuit established in *Vazquez v. Pennsylvania Dep't of Public Welfare*, 788 F.2d 130, 133 (3rd Cir.) *cert. denied*, 479 U.S. 936, 107 S.Ct. 414, 93 L.Ed.2d 365 (1986), the Court therein held that 11 U.S.C. § 106(c) of the Bankruptcy Code did not dictate a waiver of immunity from monetary claims against a state in a bankruptcy case if the state had not filed a claim in that case, on the strength of the Eleventh Amendment to the federal Constitution. The parties perceived that the Defendants would wish to raise the *Hoffman* holding as a defense in this proceeding. Indeed, on July 13, 1989, the Defendants did file the Motion to Dismiss before us raising the Eleventh Amendment issue. We therefore approved the parties' mutual request that the Defendants be allowed until July 24, 1989, to respond to the Debtor's Motion for Summary Judgment and make a filing in support of their Motion to Dismiss and that the Debtor be allowed until August 4, 1989, to file a reply brief and a response to the Defendants' Motion to Dismiss.

The parties adhered to this revised scheduling and the motions, both of which the parties deem to be dispositive of all or most of the issues in the case, are both before us. Since we need make no findings of fact, we have opted to prepare our decision, which is only partially dispositive, in a narrative format.

C. THE DEFENDANTS' MOTION TO DISMISS MUST BE DENIED: THE ELEVENTH AMENDMENT IS INAPPLICABLE HERE DUE TO THE PRESENCE OF CLAIMS OF STATE AGENCIES OTHER THAN DPW.

In *Hoffman*, the Court issued its initial decision construing 11 U.S.C. § 106, which provides as follows:

§ 106. Waiver of sovereign immunity

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

(b) There shall be offset against an allowed claim or interest of a governmen-

tal unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains "creditor", "entity", or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

We do not interpret *Hoffman* as a holding, that 11 U.S.C. § 106(c) is unconstitutional because it conflicts with the Eleventh Amendment. Rather, we believe that the Court has therein held that, due to considerations expressed in the Eleventh Amendment, Congress did not intend, by enactment of § 106(c), to abrogate the immunity of states from monetary liability in circumstances where the state has not waived this protection by filing a proof of claim in the bankruptcy case in issue. We reach this conclusion by carefully studying the following language of *Hoffman*, which appears in 109 S.Ct. at 2823:

Nothing in § 106(c) provides a similar [to §§ 106(a) and (b)] express authorization to monetary recovery from the States.

*The language of § 106(c)(2) is more indicative of declaratory and injunctive relief than of monetary recovery.* The clause echoes the wording of sections of the Code such as § 505, which provides that "the court may determine the amount or legality of any tax," 11 U.S.C. § 505(a)(1), a determination of an issue that obviously should bind the governmental unit but that does not require a monetary recovery from the States. *Under this construction of § 106(c), a State that files no proof of claim would be bound, like other creditors, by discharge of debts in bankruptcy, including unpaid taxes, see Neavear v.*

*Schweiker,* 674 F.2d 1201, 1204 (CA7 1982); *cf. Gwilliam v. United States,* 519 F.2d 407, 410 (CA9 1975), but would not be subjected to monetary recovery (emphasis added).

It is perfectly clear from this passage that the Court is reiterating its earlier holding in *Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 882–83, 27 L.Ed. 780 (1883), that the filing of a proof of claim in a bankruptcy proceeding is a "voluntary appearance of the state in intervening as a claimant of the fund in court," which waives any element of immunity under the Eleventh Amendment.

Secondly, the Court reiterates that its decision affects only claims for a "monetary recovery" and that § 106(c)(2) and § 106(c) generally remain intact insofar as the relief sought against the state in the course of a bankruptcy is declaratory or injunctive relief, or any relief short of a "monetary recovery." [4] It may be recalled that the Eleventh Amendment proscribes *any* retroactive injunctive relief against a state, even when it acts in violation of federal law, *see Edelman v. Jordan,* 415 U.S. 651, 663–70, 94 S.Ct. 1347, 1355–59, 39 L.Ed.2d 662 (1974), and bars *any* relief at all which is not based upon violation of a federal law. *See Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100–23 (1984). The Court, by its indication that declaratory and injunctive relief against a state *are* authorized by § 106(c), thus made clear that § 106(c) made at last certain inroads upon the state's protections otherwise flowing from the Eleventh Amendment.

We also must conclude that the Court did not intend that *Hoffman* be read so broadly as to allow states to be completely exempt from the impact of the Bankruptcy Code. Exempting enforcement against a state's disregard of the consequences of a bankruptcy filing could allow the states to completely ignore the consequences of a

---

**4.** The term "monetary recovery," as used by the Court in *Hoffman,* may in fact be congruent with the concept of "money damages," the scope of which the Court recently considered in *Bowen v. Massachusetts,* — U.S. —, 108 S.Ct. 2722, 2731–36, 101 L.Ed.2d 749 (1988). In *Bow-*

*en,* The Court made clear that recovery of an underpayment of sums due to a presently-active provider under a governmental grant-in-aid program under the Social Security Act are in the nature of "restitution," which is *not* a specie of "money damages."

bankruptcy filing with impunity. This result would be disastrous for debtors who have, among their creditors, states and their agencies who refuse to voluntarily acknowledge the consequences of a bankruptcy filing. *See Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (per Justice White, the author of Opinion of the Court in *Hoffman*) (Supremacy Clause protects debtors from state actions which frustrate applicable bankruptcy law).

■ Considering these principles causes us to conclude that *Hoffman* cannot be read broadly. Reading it narrowly, we conclude that the Defendants here have no viable Eleventh Amendment defense because at least one agency of the Commonwealth of Pennsylvania, *i.e.*, the Department of Revenue, has filed a proof of claim in this bankruptcy case.[5]

Eleventh Amendment immunity applies to the *states*, and through them to their agencies. A state may not selectively waive its immunity. *Hoffman* establishes that "a *State* that files no proof of claim ... would not be subjected to monetary recovery." 109 S.Ct. at 2823 (emphasis added). In *Hoffman*, the Court had before it two cases where agencies of a state had been sued by a trustee in bankruptcy court despite the fact that neither these agencies, nor, apparently, any other agencies of the same state, had filed proofs of claim in the case in which suit was brought. The Court had the opportunity to state, in its holding, that state *agencies* could not be sued for money damages if they did not file proofs of claim. Instead, the Court, in its holding, used the broader term "State." The Court thus left open the possibility that, in cases where any agency of the state has filed a proof of claim, this act constituted a waiver by the *state* of its sovereign immunity.

The Defendants' argument that a waiver by other agencies of Pennsylvania does not destroy DPW's immunity is based upon the language of 11 U.S.C. § 106(a) and (b) of the Code. It is true, as the Defendants

argue, that *those* sections provide a basis for jurisdiction only as to claims arising out of the same transaction or occurrence, or to the extent of the particular governmental agency's claims. However, the Debtor's invocation of § 106 here is not dependent upon §§ 106(a) or 106(b). Instead, they depend on other federal jurisdictional bases, including Medicaid Act and 42 U.S.C. § 1983, as applied through § 106(c).

The converse of the proposition stated in *Hoffman*, *i.e.*, that the filing of a proof of claim by the state allows any recovery against the state, even a "monetary recovery," is argued by the Debtor here. We sustain this argument and hold that, where any of a state's agencies has filed a proof of claim in a bankruptcy case, that state has consented to the jurisdiction of the federal courts as to its claims *inter se* with the Debtor. Since claims have been filed by agencies of the Commonwealth of Pennsylvania in this bankruptcy case, any relief, even a "monetary recovery," may be had against DPW by the Debtors here.

In its Reply Brief, the Debtor argues at some length that, although DPW has agreed that it is liable to reimburse the Debtor an additional $3,027,800 on the basis of the first aspect of its appeal, it is insisting that this sum be set off against a $4.1 million advance which DPW allegedly made to the Debtor five months prior to its Chapter 11 filing and that this attempt at setoff is an assertion of at least an informal proof of claim for a debt by the very agency involved in this proceeding. Such action on DPW's part, argues the Debtor, implicates 11 U.S.C. § 106(a), (b), as well as constituting a claim of *DPW* in this case which brings that very agency within the "submission of a claim" exception to immunity articulated in *Hoffman*. *Accord, In re Davis*, 20 B.R. 519, 522 (Bankr.M.D.Ga. 1982).

This argument might have some force were we able to discern any place in the Defendants' pleadings or elsewhere in the record where it is established that DPW

---

5. Indeed, the Department of Revenue has filed a claim in the amount of $94,975.49 (No. 139). Also, the Commonwealth's Department of Labor and Industry has filed a claim in the total amount of $14,952.40 (No. 190).

has in fact effected such a setoff. We are certainly not prepared to assume that DPW would assert such a setoff in apparent derogation of our holdings in *University Medical Center, supra,* 93 B.R. at 416–17; and *St. Mary, supra,* 89 B.R. at 510–13.[6]

We nevertheless conclude, on the basis previously articulated, that the claims of the Debtor here are not barred by the strictures of the Eleventh Amendment. The Defendants' motion to dismiss this proceeding on that basis must therefore be denied.

### D. THE DEBTOR HAS STANDING TO RAISE VIOLATIONS OF THE BOREN AMENDMENT AND THE CIVIL RIGHTS ACT BY THE DEFENDANTS IN THIS PROCEEDING, SINCE IT WILL BE AND IS BEING DIRECTLY AFFECTED BY SAME.

■ The Defendants question the Debtor's standing to assert the federal statutory claims arising from DPW's alleged violations of the Boren Amendment set forth in Counts IV and V of the Complaint. In *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), the Court established that the remedial powers of courts can be invoked only by parties (1) who have a particularized as opposed to a generalized grievance in common with all or many citizens; (2) whose own interests, as opposed to those of third parties, will be affected by a case's outcome. The decision of the Court which appears most closely factually analogous to the instant proceeding in *Singleton v. Wulff,* 428 U.S. 106, 112–18, 96 S.Ct. 2868, 2873–76, 49 L.Ed.2d 826 (1976). There, the Court held that physicians who had performed and intended to perform abortions could challenge state laws restricting abortions on behalf of their patients.

The Defendants cite a number of cases which they contend hold that similarly-situated providers lack standing to contest practices of governmental agencies administering the Medicaid program which are alleged to have violated the Boren Amendment, contending that the right to do so lies only with Medicaid patients, for whose benefit such laws were purportedly enacted, including *Silver v. Baggiano,* 804 F.2d 1211, 1215–18 (11th Cir.1986); *Grossman v. Axelrod,* 646 F.2d 768, 770–71 (2d Cir.1981); *Geriatrics, Inc. v. Harris,* 640 F.2d 262, 264–65 (10th Cir.1981); *Green v. Cashman,* 605 F.2d 945, 946 (6th Cir.1979); *Vantage Heathcare Corp. v. Virginia Bd. of Medical Assistance Services,* 684 F.Supp. 1329, 1331–33 (E.D.Va.1988); *Arden House, Inc. v. Heinz,* 612 F.Supp. 81, 84 (D.Conn.1985); and *Pennsylvania Pharmaceutical Ass'n v. Department of Public Welfare of Commonwealth of PA.,* 542 F.Supp. 1349, 1355–56 (W.D.Pa.1982).

We believe that citation to these cases is inapposite. In *Silver,* the court expressly declined to rule on the standing issue. 804 F.2d at 1217. Most significantly, none of these cases except *Vantage Healthcare* involve challenges by providers to the actions of state agencies to enforce the Boren Amendment. A later decision by the Court of Appeals of the circuit in which the *Vantage Healthcare* case was decided ruled directly to the contrary in *Virginia Hospital Ass'n v. Baliles,* 868 F.2d 653, 662–63 (4th Cir.1989). *See also Mary Washington Hospital v. Fisher,* 635 F.Supp. 891 (E.D. Va.1985) (same court reached the merits of a Boren Amendment challenge without discussing standing). Most of the cases cited by the Defendants involve attempts by pro-

---

**6.** We also question whether the *Hoffman* holding has any pertinence here because it is not clear that the Debtor is seeking a "monetary recovery" against DPW. In *Hoffman,* the Court had before it an action seeking to recover a preference from the state under 11 U.S.C. § 542(b). Here, the Debtor is a going concern which is seeking declaratory and injunctive relief in addition to sums that constitute restitution for an underpayment of past benefits, very akin to the claim at issue in *Bowen, see* page 650 n. 4 *supra.* We certainly do not believe that the Debtor's prayers for declaratory and injunctive relief are barred by the holding in *Hoffman,* and we question whether any attempt to recover an underpayment, as in *Bowen,* would be barred, either. However, we do concede that the claim of the *Hoffman* trustee under § 542(b) is fairly close to the claim in issue here. Therefore, we do not rely upon this reasoning as a basis for our conclusion here.

viders to assert rights to hearings before certain benefits bestowed upon them in past administration of Medicaid programs were withdrawn. These claims are distinct from challenges of computations of reimbursements due to Medicaid providers under the Boren Amendment, which bores in on an issue of obviously great particularized interest to providers. Therefore, many of the same courts which decided the cases cited by the Defendants have had little difficulty finding that providers do have standing to challenge computations of reimbursements due to providers by governmental agencies administering the Boren Amendment. *Compare Amisub, Inc. v. State of Colorado Dept. of Social Services,* 879 F.2d 789, 793–94 (10th Cir.1989); *University of Cincinnati v. Bowen,* 875 F.2d 1207 (6th Cir.1989); *Colorado Health Care Ass'n v. Colorado Dep't of Social Services,* 842 F.2d 1158, 1164 n. 5 (10th Cir.1988); and *National Union of Hospital ... Employees, etc. v. Carey,* 557 F.2d 278, 280–81 (2d Cir.1977) *with Green, supra; Geriatrics, Inc., supra;* and *Grossman, supra.*

Many other decisions expressly hold that providers have standing to challenge administration of the Boren Amendment by state agencies. *See, e.g., Coos Bay Care Center v. Oregon, Dep't of Human Resources,* 803 F.2d 1060, 1061–62 (9th Cir. 1986); *West Virginia University Hospital, Inc. v. Casey,* 701 F.Supp. 496, 510–11 (M.D.Pa.1988); *Wilmac Corp. v. Heckler,* 633 F.Supp. 1000, 1005–06 (E.D.Pa.1986); and *Thomas v. Johnston,* 557 F.Supp. 879, 902–94 (W.D.Tex.1983). Others do so by implication, proceeding to render decisions on the merits of such controversies without pausing to consider the standing issue. *See, e.g., Nebraska Health Care Ass'n v. Dunning,* 778 F.2d 1291 (8th Cir.1985); *Wisconsin Hospital Ass'n v. Reivitz,* 733 F.2d 1226 (7th Cir.1984); *Bethany Medical Center, supra; SSM Healthcare System v. Reagen,* 681 F.Supp. 625 (W.D.Mo.1988); *Friedman v. Perales,* 668 F.Supp. 216 (S.D. N.Y.1987); *Mary Washington Hospital, supra;* and *Children's Hospital of Philadelphia v. Secretary of DPW,* 568 F.Supp. 1001 (E.D.Pa.1983).

We have little doubt that the grievances asserted by the Debtor here are its own (as well as perhaps those of other providers) and that its grievances are highly particularized. The magnitude of these issues is economically life-threatening to the Debtor. We therefore have very little difficulty in concluding that it has standing to raise them.

E. THE MERITS: EXCEPT AS TO THE FIRST ASPECT OF THE DEBTOR'S CONTENTIONS, WHICH WE DEEM NOT TO BE MOOT, WE ARE NOT PREPARED TO ENTER ANY FINAL JUDGMENTS ON THIS RECORD.

1. GIVEN THE CONFUSION AS TO WHAT THE DEFENDANTS' CONCESSIONS AS TO THE FIRST ASPECT OF THE DEBTOR'S CONTENTIONS (ERRONEOUS GROUPING) MEANS IN TERMS OF REMEDIES FOR THE DEBTOR, THIS ISSUE IS NOT MOOT.

In an argument consisting of seven lines in their briefing, the Defendants state that they have "conceded" the Debtor's claims regarding its erroneous placement in Group 2 as opposed to Group 1, and that, "since the Hospital has already been paid this amount," the issue is moot, citing to, *inter alia, Thompson v. United States Dep't of Labor,* 813 F.2d 48, 51 (3d Cir. 1987).

In fact, in *Thompson, supra,* 813 F.2d at 51, the Court of Appeals states as follows:

The voluntary cessation of official activity or policy may, of course, moot a case. *New Jersey Turnpike Authority v. Jersey Central Power and Light,* 772 F.2d 25, 31 (3rd Cir.1985). The defendants, however, bear a "heavy burden" to establish mootness in such a case. *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 72, 104 S.Ct. 373, 375, 78 L.Ed.2d 58 (1983). Two conditions must be met in order for cessation of a challenged policy to moot a case. First, there must be no reasonable likelihood that the alleged wrong will recur. *Iron Arrow,* 464 U.S. at 72, 104 S.Ct. at 375.

This criterion has been interpreted to require more than speculation that a challenged activity will be resumed. *Preiser v. Newkirk*, 422 U.S. 395, 403, 95 S.Ct. 2330, 2335, 45 L.Ed.2d 272 (1975). Second, the party seeking relief must have been made whole. *County of Los Angeles v. Davis*, 440 U.S. 625, 632, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

The Defendants provide no clue in their submissions as to how the Debtor has in fact been "paid the amount" owed to it. The Debtor claims, in its Reply Brief, that this has been effected by DPW's improperly setting off the amount due to the Debtor against the $4.1 million pre-petition loan from DPW to the Debtor. If this is in fact what DPW means, there are serious questions as to whether the erroneous official action of misgrouping the Debtor which has been challenged herein has been in fact "corrected" in a legal manner, let alone whether such conduct will be undone or "resumed," and that the Debtor has been voluntarily "made whole" by DPW. Under these circumstances, the Defendants fell far short of satisfying their "heavy burden" of establishing mootness.

Having carefully reviewed the Debtor's submissions and the administrative decisions supporting its position on the "erroneous grouping" aspect of its claims, it is apparent that this is the strongest aspect of its claims and that, even had the Defendants not conceded the merit of the Debtor's contentions on this score, it is very likely that the Debtor would have prevailed. Given the Defendants' concession, we have no hesitancy in rendering summary judgment in favor of the Debtor in the amount of $3,027,800,[7] based on a finding in its favor on this first aspect of its three claims.

7. The Defendants concede the accuracy of this figure. We further note, however, that the Debtor, in its Motion for Summary Judgment, also requests that it be awarded "interest and attorney fees" in connection with its claims. We believe that it is premature to consider the issue of attorney's fees at this juncture, since we are only ruling on one, presently uncontroverted claim. It is unclear whether this request for

## 2. SUMMARY JUDGMENT CAN BE RENDERED AS TO THE OTHER ASPECTS OF THE DEBTOR'S CLAIMS ONLY IF ALL DOUBTS AS TO ISSUES OF FACT REMAINING IN THE RECORD ARE RESOLVED AGAINST THE DEBTOR AND WE CAN NEVERTHELESS RULE IN ITS FAVOR AS A MATTER OF LAW.

Pursuant to B.Rule 7056, which states that Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 56 applies, in its entirety, to adversary proceedings, summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). *See* F.R.Civ.P. 56(a).

A threshold issue here is determining what, of particularly the two volumes of documents submitted by the Debtor in support of its Motion, actually falls within the categories of the materials referenced in F.R.Civ.P. 56(c). They were not presented in the form of exhibits to the affidavits. Furthermore, we are not clear what, of the testimony, documents, and exhibits included therein, is actually part of the administrative record here, and hence technically meets the criteria of F.R.Civ.P. 56(c). Even if we could leap over this arguably technical observation, *cf. In re Jackson*, 92 B.R. 987, 991–93 (Bankr.E.D.Pa.1988), and consider everything in the volumes of documents to meet the requirements of F.R. Civ.P. 56(c), we confess that we find these submissions a potpourri. Materials from a proceeding as dated as 1983 are juxtaposed with possibly incomplete excerpts of a mass of transcripts and depositions which were apparently generated partly in 1985

interest includes a demand for pre-judgment interest. If it does, we are uncertain whether the Debtor is entitled to same and how the Debtor means for this to be calculated. We therefore shall require the Debtor to file a subsequent separate motion to request any sum for "interest or attorneys fees" in our Order accompanying this Opinion.

and partly in 1987. We find these documents dated and inconclusive in many instances. Several of the page references to these documents in the Debtor's Briefs are misleading.[8]

In *Jackson, supra,* 92 B.R. at 990–91, as in other decisions cited therein, we have repeatedly emphasized that we must exercise caution in entering summary judgment due to the drastic nature of the remedy that it contemplates, *i.e.,* entry of a judgment against a party without allowing that party its full day in court. All issues of fact concerning which we, on the record properly presented on the summary judgment motion, have any doubts, must be resolved against the moving party. It is against this difficult standard that we are compelled to measure the fragmented record presented by the Debtor in support of its motion.

We recognize that the Defendants were not entitled to stand on the allegations of their pleadings in responding to the Debtor's motion, but have an affirmative duty to submit opposing materials. *See, e.g., In re Fleet, Fleet v. United States Consumer Council, Inc.,* Bankr. No. 81–04969S, Adv. No. 83–0880S, slip op. at 9–10 (Bankr.E. D.Pa. May 17, 1989), *recommendations adopted,* 95 B.R. 319 (E.D.Pa.1989). We recognize that summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); and *Fleet, supra,* slip op. at 9. However, the Defendants here did file an Answer to the Debtor's Motion (as well as their own Motion to Dismiss) and submitted therewith an Affidavit of Sheran M. Sturm, the Acting Chief of the Acute Care Hospital Section of DPW's Bureau of Hospital and Outpatient Programs of its Medicaid programs, which in substance denies that the Debtor operated efficiently or economically or that the overwhelming need for Medicaid providers in the Debtor's service area alleged by the Debtor is accurate.

We are therefore inclined to review the Debtor's claims that it is entitled to summary judgment as to the second and third aspects of its claims with a most critical eye. Judgment can be entered for the Debtor as to these claims only if all facts properly presented into the record support a recovery.

3. THE CLAIMS OF THE DEBTOR WHICH ARE BASED UPON DPW'S ALLEGED VIOLATION OF THE PROVIDER AGREEMENT HAVE NO MERIT, SINCE THAT AGREEMENT MERELY REQUIRES DPW TO PROVIDE PAYMENTS IN A MANNER CONSISTENT WITH APPLICABLE VALID FEDERAL AND STATE REGULATIONS; HENCE COUNT I OF THE COMPLAINT WILL BE DISMISSED.

In Count I of its Complaint, the Debtor attempts to advance a breach of contract claim against the Defendants. The essence of this claim is that the Provider Agreement of July 1, 1977, bound DPW to pay the Debtor's "reasonable costs" to it, as DPW determined them, in full. See page 645 *supra.* The Debtor argues that, where one party to a contract has the power to determine reasonable compensation, its discretion is not unbounded, and that DPW's present determinations are so insufficient as to be unreasonable definitions of "reasonable costs."

█ This argument might have some force in the ordinary contract setting. However, the Provider Agreement, while inelegantly drafted, makes clear in numerous of its provisions, including the specific paragraph upon which the Debtor relies (paragraph 4, quoted at page 645 *supra*) that it is subject to applicable federal and state regulations. DPW is, then, only obliged to comply with the terms of the Provider Agrement insofar as it may do so in light of federal and state regulations

---

**8.** For example, the Debtor repeatedly states that the AE made factual findings supportive of its position in his Adjudication. In fact, the Debtor often cites to portions of the Adjudication in which the AE was merely paraphrasing the posi-

tions of the Debtor prior to rendering a decision rather than actively making independent findings of his own on these points in the course of his decision-making.

currently in effect. If the Debtor's contrary interpretation that DPW must comply with the regulations in effect at the time of the execution of the Provider Agreement were accepted, then such a Provider Agreement, which seems to be merely a form document envisioned to memorialize a hospital's participation in the Medicaid program, could, as long as it was in effect, require a state to disregard Congress's direction to effect change in reimbursement formulas and cut costs in administration of the Medicaid program. We refuse to accept such a contention. The Provider Agreement, created as it was as a disbursement mechanism for federal and state aid programs, can only be interpreted in light of present federal and state regulations and thus not to prevent reform of those programs.

The Debtor cites a number of cases supporting its contention that DPW's change in reimbursement formula constitutes an unconstitutional impairment of its contractual rights by the state government. However, the cases cited dealing with impermissible government impairment of contracts deal with the actual modifications of material elements of the contracts in issue. Here, there is no modification of the Provider Agreement other than a different means of determining "reasonable costs" because of·a change in regulations to which the Agreement was expressly subject.

█ Nothing in the contract should be read to prohibit Congress or DPW from deciding that the "reasonable" costs for a hospital to incur are the average costs of hospitals similarly situated, as opposed to those actually incurred by the Debtor, even if it is not economically and efficiently operated. As we indicate hereafter, at pages 658–59 *infra*, we question whether the Defendants have accurately applied the Boren Amendment, and implicitly hold that the Debtor can raise the question of whether such averaging or grouping is always permissible as the exclusive procedure to be utilized, particularly when applied to the Debtor. However, the Provider Agreement cannot limit the power of Congress and DPW to change, even drastically, the

determination of what is "reasonable" under the federal government's own programs.

Arguments similar to the contract-violation argument raised by the Debtor here have been uniformly unsuccessful in other cases challenging changes in reimbursement formulas where providers and governmental entities have been parties to contracts similar to the Provider Agreement in issue here. *See Bennett v. Kentucky Dep't of Education*, 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985); *Colorado Health Care Ass'n, supra*, 842 F.2d at 1172–73; *Hollander v. Brezenoff*, 787 F.2d 834, 838–39 (2d Cir.1986); *Wisconsin Hospital Ass'n, supra*, 733 F.2d at 1231–32; *Germantown Hospital v. Heckler*, 590 F.Supp. 24, 30–31 (E.D.Pa.1983), *aff'd*, 738 F.2d 631 (3d Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); and *Illinois Council on Long Term Care v. Miller*, 579 F.Supp. 1140, 1148–49 (N.D.Ill.1983). Tellingly, the Debtor has not cited any cases where courts have determined that the existence of provider agreements such as that in issue here prevent a governmental agency from changing its reimbursement formula.

We recognize that, because we are considering matters outside the pleadings in deciding this issue, we must treat this defense of the Defendants as a motion for summary judgment in their favor on this issue, not as a motion to dismiss. B.Rules 7012(b) and 7056 and F.R.Civ.P. 12(b)(6) and 56(b). *See, e.g., In re Amatex Corp.*, 97 B.R. 220, 223–24 (Bankr.E.D.Pa.1989), *aff'd sub nom. Amatex Corp. v. Stonewall Ins. Corp.*, 102 B.R. 411 (E.D.Pa.1989). However, even though the Defendants have not filed a motion for summary judgment as to Count I, we may proceed to dismiss this Count in light of our perception that, even if all issues of material fact are resolved against the Defendants, the Defendants are nevertheless entitled to judgment in their favor as a matter of law. *See, e.g., In re Zerodec Megacorp, Inc.*, 60 B.R. 884, 887 (E.D.Pa.1985); *Gay v. Merritt*, 602 F.Supp. 1383, 1384 (E.D.Pa.1985) (per LUONGO, CH. J.), *aff'd*, 791 F.2d 917 (3d Cir.1986); *Kaiser v. Dialist Co. of Tex-*

*as,* 603 F.Supp. 110, 110 (W.D.Pa.1984) (per MANSMANN, J.); and 6 J. MOORE, FEDERAL PRACTICE, ¶ 56.12, at 56–161 to 56–165 (2d ed. 1988).

Following the clear weight of cases supporting the substance and procedure of our so proceeding, we shall grant summary judgment to the Defendants and proceed to dismiss Count I of the Debtor's Complaint, based upon a contract theory.

4. WE ARE NOT PREPARED TO ENTER JUDGMENT ON THIS RECORD FOR EITHER PARTY ON THE CLAIMS OF THE DEBTOR BASED UPON THE DEFENDANTS' ALLEGED FAILURE TO COMPLY WITH APPLICABLE FEDERAL LAW IN ITS MEDICAID REIMBURSEMENT PROCEDURES IN REFERENCE TO THE DEBTOR; HENCE, TRIAL MUST PRECEDE THEIR DISPOSITION.

We have carefully examined the authorities cited by the parties which have decided contentions by providers that governmental agencies charged with enforcement of the Boren Amendment have developed procedures for Medicaid reimbursement which are violative of that law. We have uncovered several more. We find that a number have rejected attacks made upon particular procedures adopted by the governmental agencies. *See Colorado Health Care Ass'n, supra,* 842 F.2d at 1166–72 (suspension and ultimate elimination of "incentive allowance" compensation to nursing homes whose administrative costs were particularly high); *Wisconsin Hospital Ass'n, supra,* 733 F.2d at 1230–38 (freeze of reimbursement rates to hospitals for a three-month period); *Mississippi Hospital Ass'n v. Heckler,* 701 F.2d 511, 516–24 (5th Cir.1983) (procedures utilized to adopt regulations; only denial of Medicaid litigation costs invalidated); *SSM Healthcare System,* 681 F.Supp. at 627–31 (per diem cap on reimbursement of "disproportionate share" hospitals); *Friedman, su-*

*pra,* 668 F.Supp. at 221–25 (real property cost reimbursement rates of health care facilities); *Illinois Council, supra,* 579 F.Supp. at 1140, 1144–50 (procedures and purported motives in enacting regulations); and *Children's Hospital, supra,* 568 F.Supp. at 1007–12 (preliminary injunction against temporary hospital rate caps).[9] However, a number of cases have declared that at least certain aspects of procedures adopted by governmental agencies to enforce Medicaid regulations are unenforceable. *See Amisub, supra,* at 794–801 (establishment of reimbursement rates beneath those incurred by all providers in state); *University of Cincinnati, supra,* 875 F.2d at 1209–12 (exclusion of sums related to services performed at outpatient clinics); *Alabama Nursing Homes v. Harris,* 617 F.2d 388, 394–96 (5th Cir.1980) (utilization of reimbursement ceilings in Medicaid program simply because they were also used in nursing home reimbursements); *West Virginia University Hospital, supra,* 701 F.Supp. at 512–23 (DPW's reimbursement of all out-of-state hospitals at a single rate rather than by groupings, as in the case of in-state hospitals); *Illinois Hospital Ass'n v. Illinois Dep't of Public Aid,* 576 F.Supp. 360, 367–69 (N.D.Ill.1983) (adoption of reduced interim rates of reimbursement which were below established final rates due solely to state's budgetary deficiencies); *California Hospital Ass'n v. Schweiker,* 559 F.Supp. 110, 116–17 (C.D. Cal.1982) (six (6%) percent cap on increases in reimbursement); and *Thomas, supra,* 557 F.Supp. at 904–15 (arbitrary establishment of rate structure, which failed to include several relevant factors, particularly the degree of the provider's specialization). We have not included *Mary Washington Hospital, supra,* in either category, as its outcome partially supports both parties. The court there held that the general procedures adopted by the state agency, including "peer groupings" similar to those effected by DPW here, were acceptable. 635 F.Supp. at 897–902. However, that court also held that a hospital should be accorded

9. Excluded from this group is *Bethany Medical Center, supra,* also cited by the Defendants, because the resolution in that case was made solely on the basis of mootness, not the merits. 693 F.Supp. at 974–77.

an appeal process which would permit it to be treated as a special case, apart from the established "peer groupings." *Id.* at 903–06. Such a broad scope of appeal may be all that the Debtor requests and actually needs to succeed on the merits of its claims here.

Most of these cases indicate that the standard of review applied to determining the enforceability validity of the agency procedures is that set forth in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), *i.e.*, whether the agency's actions are "arbitrary and capricious." This is obviously a difficult standard to meet. *But see In re Huderson*, 96 B.R. 541, 547–54 (Bankr.E.D.Pa.1989), *aff'd sub nom. Huderson v. United States Dep't of HUD*, C.A. No. 89–2152 (E.D. Aug. 9, 1989) (applying this standard, HUD's decision to deny acceptance of an assignment of a governmentally-insured mortgage to it is reversed). However, in *Amisub, supra*, at 795–96, the Tenth Circuit Court of Appeals held that a court reviewing state Medicaid reimbursement procedures "must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations, and not limit its analysis to whether the nonadjudicatory agency findings are arbitrary and capricious." *Id.* at 795. According to *Amisub*, then, it appears that the Debtor could succeed by merely showing that the procedures of DPW are violative of the Boren Amendment and not only by establishing that DPW's procedures are "arbitrary and capricious," either on their face or as applied to it.

Given the fragmented state of the record here, see pages 654–55 *supra*, we are not prepared to hold on the basis of this record that, as a matter of law, DPW has acted illegally or arbitrarily and capriciously in refusing to cap DME costs at the FY 1985 level and/or in adhering strictly to its grouping process for determination of the rates of reimbursement to hospitals, either generally or as applied to this particular institution. We note that the court, in

*West Virginia University Hospital, supra*, 701 F.Supp. at 498, heard testimony for six days on an issue as to which it appears that the court could more easily act intuitively than on the issues at bar. *See also Amisub, supra*, 796 (court influenced by record made at trial); *Friedman*, 668 F.Supp. at 225 (provider failed to "produce evidence" that real property cost reimbursement procedure was actually responsible for the provider's loss of profit); and *Thomas, supra*, 557 F.Supp. at 891–93, 895–96, 906–10 (court makes considerable references to factual testimony presented to it).

On the other hand, we are not intuitively convinced that DPW did not act illegally and/or arbitrarily and capriciously in refusing to provide the Debtor with treatment which was special but was nevertheless required by the Debtor's special circumstances. We are not concerned, in this matter, with mere interim or temporary reimbursements caps, as in *Wisconsin Hospital Ass'n, supra;* and *Children's Hospital, supra*. In contrast to the comments of the court regarding the institution involved in *Mary Washington Hospital, supra*, 635 F.Supp. at 902, we have direct personal evidence that hospitals in the City of Philadelphia are filing bankruptcy petitions at an alarming rate, which may in fact be attributable in large part to DPW's policies. *See In re Metropolitan Hospital*, Bankr. No. 89–12542F (Bankr.E.D.Pa.); *In re St. Mary Hospital*, 86 B.R. 393, 395–97 (Bankr.E.D.Pa.1988); and *In re University Medical Center*, 82 B.R. 754 (Bankr.E.D. Pa.1988). *Compare Amisub, supra*, at 797–800 (court was properly impressed by the fact that no hospital in the state would receive reimbursement of its actual costs under the state plan in issue); and *Illinois Hospital Ass'n, supra*, 576 F.Supp. at 365 (court was impressed with evidence that eight providers in its service area were severely financially threatened by the state agency's policies). It is particularly disturbing to us to note the plight of the Debtor and St. Mary Hospital, institutions which are highly-regarded as purveyors of quality services to persons unlikely to get such services elsewhere by members of

their respective communities. The Debtor, an institution whose presence is necessary to save the lives of countless persons in its community, may literally be fighting for its own life. In such circumstances, it may be inappropriate to deny the Debtor the special treatment which the court, in *Mary Washington Hospital*, 635 F.Supp. at 903–06, deemed was necessary as to even the less visibly-threatened institution in issue there. In these circumstances, it is important that the government agency meet its burden of establishing that its procedures comply strictly with applicable federal law and that a rational relationship between the relevant factors and data and the procedures established exists. *See Colorado Health Care Ass'n*, 842 F.2d at 1167. Thus, while we are not convinced that the Debtor has met its considerable evidentiary burden on this record, we see very little hard evidence in the record positively supporting DPW's contention that the procedures adopted by it are in fact legal and rational.

We are therefore in need of more evidence before we can rule on these issues. We believe that it is incumbent upon the Debtor to prove that it has been reasonably efficient and economical. If not, the losses which have resulted to it are merely the intended consequence of the Boren Amendment, *i.e.,* driving out a provider whose wasteful practices have fed the escalation of hospital costs. It is necessary for the Debtor to prove and quantify some of its offhand assertions (*e.g.,* its poor clientele requires longer and more intense treatment than the clientele of hospitals in more affluent areas; its place at the lowest end of certain of the spectra of groupings skews the final result to its extreme disadvantage). It is necessary for it to establish its lack of alternatives to avoid financial ruination and the direct relationship between the spate of recent hospital bankruptcy· filings, including its own, and DPW's policies.

On the other hand, we believe that DPW should provide evidence as to its alternatives (or lack of alternatives) to the choices of policies which it followed in FY 1987 and FY 1988 as to the Debtor. It should commit itself clearly as to its policies on appeals: will it make an exception to its general procedures *if* it is convinced that its procedures are unfair and financially devastating to deserving and necessary institutions? We also were informed that DPW made changes in its procedures in FY 1989, and that these have been attacked by many hospitals in the state in the *Albert Einstein* case, *supra.* It would be relevant to know what changes were made in FY 1989 and why these were made; why and on what basis these hospitals have challenged the new procedures; and the status of this proceeding.

However, until some or all of these factual matters or others which we have doubtless overlooked have been addressed in a record made here, we are not prepared to enter judgment, summary or otherwise, on these latter two aspects of the Debtor's claims. A trial before us will therefore be necessary.

While these factual matters may be difficult to address in a trial scheduled shortly hereafter, we also suspect that prompt resolution of all of the issues raised herein is crucial to the Debtor's reorganization. We also believe that the years of experience which the parties have had in crystallizing these issues will serve them well in preparing for trial expeditiously. Furthermore, while we have not resolved the merits of the Debtor's principal claims, we have resolved herein several issues which could have proven time-consuming and distracting in the efforts of the parties and the court to render a decision on the merits. We have therefore appended hereto a Pretrial Order which contemplated commencement of trial in about 60 days. If this is totally unrealistic, we feel confident that the parties will so advise us.

## F. CONCLUSION

An Order consistent with the views of the court expressed in this Opinion will be entered.